United States Court of Appeals,

Fifth Circuit.

No. 93-5396.

In the Matter of Elray RASH and Jean Rash, Debtors.

ASSOCIATES COMMERCIAL CORPORATION, Appellant,

v.

Elray RASH and Jean Rash, Appellees.

Sept. 13, 1994.

Appeals from the United States District Court Eastern District of Texas.

Before REYNALDO G. GARZA, SMITH and PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The Associates Commercial Corporation ("ACC") appeals the district court's confirmation of a reorganization plan under chapter 13 of the Bankruptcy Code (the "code"). Because the district court erred as a matter of law in calculating the value of ACC's secured claim under 11 U.S.C. § 506(a), we reverse.

I.

A.

On March 30, 1989, Elray and Jean E. Rash[1] purchased a commercial truck at retail value of $73,700 by entering into a sales agreement and related documents ("loan documents") with Janoe Truck Sales & Service, Inc., d/b/a Janoe Kenworth Trucks ("Janoe"). The truck served as collateral for the loan. Rash owns and operates the truck as part of his freight hauling business. Janoe

_____

[1]For simplicity, the Rashes are referred to simply as "Rash."

1

assigned the loan documents to ACC, which holds a valid lien on the collateral.

Under the terms of the loan, Rash was obligated to pay to ACC $1,610.41 per month for sixty months, maintain the collateral, and keep it adequately insured. In February 1992, Rash and ACC agree to reschedule his obligation upon his agreement to pay $1,408.33 for thirty-six months.

B.

In March 1992, Rash filed a petition for bankruptcy under chapter 13. Rash recognized ACC's superior lien on the collateral. Pursuant to his chapter 13 plan, Rash proposed that ACC retain its lien and be paid $607.79 per month for fifty-eight months, beginning after confirmation, for a principal total of $28,500, plus interest at nine percent. Rash represented in the plan that the collateral would remain insured but that the proposed payment "represent[ed] payment of the value of the Collateral in full with interest over the life of the Plan," which was for five years. Rash's plan made ACC a partially unsecured creditor that Rash could treat as holding a partially unsecured claim. Rash's plan also set forth that unsecured creditors "shall receive in pro-rata amounts all amounts remaining after priority and secured debts are paid."

On May 1, 1992, ACC filed a motion for relief from stay, alleging that Rash had no equity in the collateral. ACC subsequently filed a proof of claim in the secured amount of $41,171.01. Rash responded that the value of ACC's collateral was only $28,500 and that the remainder of ACC's claim was unsecured.

2

ACC challenged Rash's plan as inequitable because it did not pay ACC what it could have received in a chapter 7 liquidation and infeasible because it did not conform to the requirements of chapter 13.

At a hearing in bankruptcy court, ACC's expert testified that the market value of the truck was $41,000. "Market value" was defined as "what an individual, average individual off the street" would pay for the truck, or the price that would be received from a public auction sale. Rash's expert testified that market value should be determined by the wholesale value of the truck, $31,875. He applied the wholesale value because he said that the difference between wholesale and retail value represents the margin between a dealer's costs of marketing, reconditioning, payment of sales commissions, and a dealer's profit. Both experts agreed as to the retail value of the truck; they just disagreed as to whether the retail or wholesale value should be used.

The bankruptcy court adopted the measurement proffered by Rash's expert. In line with this value, Rash filed an amended chapter 13 plan promising to pay $31,875 in fifty-eight installments plus nine percent interest, with the remaining value of ACC's claim to be paid pro-rata as an unsecured claim. The bankruptcy court confirmed this plan, 149 B.R. 430, and the district court affirmed.

## II.

Under § 1325(a)(5)(B) of the code, 11 U.S.C. § 1325(a)(5)(B), a secured creditor must receive the present value of its allowed

secured claim under a chapter 13 plan of reorganization. Unless the creditor's present value is preserved, confirmation cannot occur over the creditor's objection. The allowed secured claim is determined by 11 U.S.C. § 506(a), which provides, in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property....

We first look to the text of the statute, construing its terms according to their plain meaning. *Patterson v. Shumate,* --- U.S. ----, ----, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992). Each term must be given effect so as to avoid rendering an part of the statute inoperative. *United States v. Nordic Village, Inc.,* --- U.S. ----, ----, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). If a term is ambiguous, it should be construed consistently with other terms in the statute so as to produce a symmetrical whole and avoid creating tension in the statute. *Federal Power Comm'n v. Panhandle E. Pipe Line Co.,* 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949).

Cases construing § 506(a) have focused on two different clauses whose relative emphases lead to differing results. *See In re Green,* 151 B.R. 501, 502 (Bankr.D.Minn.1993). One line of cases rests on the language of § 506(a)'s first sentence, which provides that the creditor's claim is secured to the extent of the value of

its interest in the estate's interest in such property. Under this approach, the secured creditor is entitled to receive, in the chapter 13 plan, the amount it could have obtained if the collateral were foreclosed upon and sold by the creditor.

This "foreclosure approach" was followed by the bankruptcy and district courts in the current case and in *In re Mitchell,* 954 F.2d 557 (9th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992). *But see Lomas Mortgage USA v. Wiese (In re Wiese),* 980 F.2d 1279, 1286 (9th Cir.1992), *vacated on other grounds,* --- U.S. ----, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993) (suggesting that the decision in *Mitchell* contradicts the language of § 506(a) and illogically "allow[s] the debtor to keep the home but value[s] the secured portion based upon a hypothetical sale of the residence"). Because the foreclosing creditor is not a dealer in the property comprising the collateral, it could not resell the collateral at retail prices. Thus, its interest is the wholesale price it would receive by selling the property to a retailer. *Green,* 151 B.R. at 504. Under this approach, the court will also generally deduct, from the wholesale price, the costs that would be incurred in executing the resale.

A second line of cases relies upon the second sentence of § 506(a), which provides that the creditor's lien interest must be valued in light of the purpose of the valuation and the proposed disposition or use of the collateral. "Where the debtor proposes to retain and use the collateral, and the purpose of the valuation is to determine the amount that an undersecured creditor will be

5

paid on its secured claim under the debtor's plan, the value of the creditor's lien is derived from the stream of payments that the lien secures, rather than the right to foreclose, since no liquidation of the collateral is contemplated." *Green,* 151 B.R. at 504.

Under this "replacement model," the "value of the lien should be based on the retail value of the collateral since such is the replacement value to the debtor;  and the costs associated with sale of the collateral should not be deducted since no sale is contemplated." *Green,* 151 B.R. at 504. *See In re Coker,* 973 F.2d 258, 260 (4th Cir.1992);  *Brown & Co. Sec. Corp. v. Balbus (In re Balbus),* 933 F.2d 246, 251-52 (4th Cir.1991).  Proponents of the "replacement cost" approach argue that it is the only one that gives effect to the entire language of § 506(a), whereas the foreclosure approach ignores the second sentence of the statute.

We agree that the replacement cost approach is the only one that gives full effect to the language of § 506(a).  Under that subsection, we must consider the "purpose of the valuation" and "the proposed disposition or use" of the property by the debtor. "If the first sentence of § 506(a) were interpreted to mean that the value must be fixed at the amount which the creditor would receive on foreclosure, then the last sentence of the statute which provides that the value should be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, would be surplusage." *In re Courtright,* 57 B.R. 495, 497 (Bankr.D.Or.1986);  *see also In re Bergh,* 141 B.R. 409, 419

(Bankr.D.Minn.1992) (noting that the "key phrase in § 506(a) is "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property....' ").

Moreover, § 506(a) instructs us to value the creditor's interest according to "the estate's interest" in the property. The "estate's interest in the property" is the ownership and possession of the vehicle by the debtor, *see Mitchell,* 954 F.2d at 561 (Noonan, J., dissenting), and thus the creditor's interest is derivatively defined by the value of the debtor's interest in the property.

If the debtor retains the property as part of a reorganization, the proper measurement of the estate's interest in the property is the "going-concern" value of the collateral to the debtor's reorganization. The value to the debtor of retaining and using the property can best be measured by what he would have to pay to purchase another truck. *See id.* (Noonan, J., dissenting). Under § 506(a), the court must value the collateral in light of its purpose and proposed use in the reorganization. Going concern, or replacement, value accounts for the debtor's proposed use of the property, whereas foreclosure value does not. "[W]hen a debtor intends to continue use of creditor's collateral, the Debtors are acknowledging the value of the collateral to be greater than if liquidated. Therefore, creditor's secured claim is entitled to be valued to the extent of its contribution to the entire estate vis-a-vis "going concern value'...." *In re Penz,* 102 B.R. 826, 828

7

(Bankr.E.D.Okla.1989); *see also In re Reynolds,* 17 B.R. 489 (Bankr.N.D.Ga.1981).

The creditor has a security interest in an income stream derived from the loan. Thus, the creditor's interest is the full amount of its debt, limited only by the estate's interest in the collateral. As the court wrote in *Green:*

> It is true that the plain meaning of the first sentence of section 506(a) requires a valuation of the creditor's lien interest in the collateral. However, the fact that a lien in property gives the lienholder a right to repossess and sell the collateral does not automatically mean that the value of the lien is equal to the amount that the creditor would receive upon disposition of the collateral in satisfaction of its lien. It must be remembered that a lien is fundamentally a *security* interest which secures payment of an obligation. To value such an interest in property based solely on the amount that could be realized upon sale of the collateral ignores the value associated with the right to receive the stream of payments that the lien secures.

*Green,* 151 B.R. at 505 (emphasis in original).

The stream of payments in which the creditor has a security interest will be greater in nominal value than the value of the collateral alone because it includes the opportunity cost to ACC of being forced to continue to tie up money in a loan with Rash, rather than being able to lend this money to someone else. The loss to the creditor is not just the inability to foreclose and receive the value of the collateral, but includes the inability to foreclose and then re-lend the money to someone else. "[I]f he creditor was not forced to lend to this debtor, then it could lend those funds to a different borrower. This is the real cost of the inability to foreclose." Todd J. Zywicki, *Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code,* 19

8

T. MARSHALL L.J. 241, 262 (1994). "[V]aluation based on a hypothetical sale ignores the purpose of the valuation which is to determine the amount an undersecured creditor will be paid *for the debtor's continued possession and use of the collateral,* not to determine the amount such creditor would receive if it had to repossess and sell the collateral." *Green,* 151 B.R. at 505 (emphasis added).

This foregone loan would have been secured by collateral valued according to its retail value. When Rash initially borrowed the money to buy the truck, the loan amount was for the retail price of the truck, not merely the wholesale amount. Reducing the security interest to its wholesale value would allow parties to use bankruptcy to alter their substantive rights as defined outside bankruptcy. Indeed, a debtor could use bankruptcy to knock-down the secured creditor's interest to wholesale value, then turn around and resell the collateral at retail blue-book value and pocket the difference. Wherever possible, we try to preserve the terms of the parties' original bargain so that bankruptcy is not used opportunistically to renegotiate the terms of a voluntary agreement or to generate a windfall for one party or the other. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

Awarding the secured creditor only the wholesale value of the collateral would undercompensate the creditor in bankruptcy. Allowing the debtor to decrease the value of its collateral by filing bankruptcy would lead to inefficient self-protection

9

measures by creditors, such as requiring debtors to put more cash down at the time of purchase or charging a higher interest rate to offset the risk that the debtor will file bankruptcy and strip down the value of the creditor's security interest. Unable to distinguish between good and bad borrowers, creditors will "alter their behavior towards debtors as a *class.*" Zywicki, *supra,* at 263. This will actually *harm* debtors, for, as a result, "[t]he apparent pro-debtor effects of the bankruptcy rule will be eliminated by the increased rate charged to debtors as a class." *Id.*

It has been suggested that reinstating the secured creditor's interest to its full retail value would be counterproductive, as it would offer the debtor no relief, thereby undermining the rehabilitative purposes of chapter 13. Any benefit that this would provide to debtors, however, would be pyrrhic, as any advantage gained in reorganization would be offset by increases in downpayments and interest rates at the initial time of the loan.

Moreover, while reorganization of the debtor is an important policy goal, this goal cannot be pursued by exterminating a secured creditor's property interest. "Reorganization is not a Holy Grail to be pursued at any length." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 808 F.2d 363, 376-77 (5th Cir.1987) (en banc) (Clark, C.J., concurring), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Secured creditors should not be forced to bear the burden of the debtor's reorganization. *But see United Sav.*

*Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 378–79, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988) (noting that even if secured creditors do not bear one kind of reorganization cost, they may still bear others).

The replacement approach is consistent with the Supreme Court's holding in *Timbers of Inwood Forest, see Mitchell,* 954 F.2d at 562 (Noonan, J., dissenting). In construing § 362(d)(1), the Court reviewed the similar language of § 506(a), concluding that "the creditor's "interest in property' [in § 506(a) ] obviously means his security interest without taking account of his right to immediate possession of the collateral on default." 484 U.S. at 372. Thus, the interest being protected by § 506(a) "is merely a security interest, which is a right to have the collateral applied in satisfaction of a debt, not a right to immediate possession of the collateral." *Green,* 151 B.R. at 505.

Thus, retail value is the proper measurement for purposes of determining an undersecured creditor's allowed amount of a secured claim under § 506(a). Both wholesale valuation and techniques that average wholesale and retail values, *see, e.g., In re Carlan,* 157 B.R. 324 (Bankr.S.D.Tex.1993), undercompensate the secured creditor and provide an invalid windfall to the debtor.

Finally, it is argued that profit should be eliminated from calculations of the value of the creditor's lien. *See In re Miller,* 4 B.R. 392 (Bankr.S.D.Cal.1980). This is incorrect, as what is deemed "profit" is actually the opportunity cost of keeping ACC's money tied up in Rash's loan and the normal return on

11

capital, without which the loan will not be made.  *See* Zywicki, *supra,* at 261-62.

## III.

The bankruptcy and district courts erred as a matter of law by using wholesale instead of retail value to calculate the secured portion of ACC's claim.  Thus, we REVERSE the district court's confirmation of the plan and REMAND for recalculation of the allowed amount of ACC's secured claim for purposes of the plan.