**In re Donald TAFFI; Madelaine Taffi, Debtors.**

**Donald TAFFI; Madelaine Taffi, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**Nos. 94–55011, 94–55019.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1995.

Decided Oct. 10, 1995.

A. Lavar Taylor, Santa Ana, California, for plaintiffs-appellants.

Paula K. Speck, United States Department of Justice, Tax Division, Washington, D.C., for defendant-appellee.

Before: WALLACE, Chief Judge, KOZINSKI and RYMER, Circuit Judges.

Opinion by Chief Judge Wallace; Dissent by Circuit Judge KOZINSKI.

WALLACE, Chief Judge:

The Taffis (Debtors) appeal from the district court's judgment in favor of the Internal Revenue Service (IRS). The district court held that for purposes of valuing a secured tax lien on the residence the Debtors will retain, the residence should be valued at its "fair market" value and that "hypothetical costs of sale" should not be deducted. The district court also refused to eliminate the unsecured portion of the IRS's lien upon confirmation of the Debtors' reorganization plan. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 158(d), 1291. We affirm the district court's valuation of the lien, but reverse and remand for the limited purpose of having the district court reduce the amount of the IRS's tax lien to its allowed secured claim.

I

This case requires us to address two issues of first impression in this circuit. The first is whether the residence of a debtor should be valued, for purposes of determining the amount of a secured claim, at that residence's "fair market" value or "forced sale" value, when the debtor is to keep possession of the residence. The second issue is whether "hypothetical costs of sale" are to be subtracted from the valuation of the residence when determining the amount of the secured claim.

Debtors filed a Chapter 11 bankruptcy petition on May 22, 1991. The petition was filed because the IRS and the California Franchise Tax Board (FTB) had assessed the Debtors for taxes due in the amount, respectively, of $490,940.00 and $89,940.00. Both the IRS and the FTB filed tax lien notices for the deficiency. Debtors' personal property was worth about $10,000.00. Debtors did own a residence, but it was encumbered with four deeds of trust totaling $233,942.38, all senior to the IRS and FTB liens.

It was stipulated that the fair market value of the residence was $300,000.00. That value represented what a willing and fully-informed buyer would pay under fair market conditions. It was also stipulated that the hypothetical costs of selling the residence in the marketplace would be nine percent, or $27,000.00. Taking into account the senior liens, the IRS would thus receive $66,057.62, or, if hypothetical costs of sale are deducted, $39,057.62. It was further stipulated that the residence would sell for only $240,000.00 under forced sale conditions. Thus, under the forced sale scenario, the IRS would receive only $6,058.62, after taking into account the senior liens and nothing if hypothetical costs of sale are deducted.

The bankruptcy court confirmed the plan of reorganization on February 27, 1992. The IRS did not object to the plan or the order confirming the plan. Because the IRS's lien was senior to the FTB lien, the entire FTB lien was unsecured and thus, under the plan, void. In a published opinion, the bankruptcy court determined that the value of the IRS's secured claim should be based on the forced sale value of the Debtors' residence. *Taffi v. United States,* 144 B.R. 105 (Bankr.C.D.Cal. 1992). Having determined that the proper valuation of the IRS's secured claim was based on the forced sale value, the bankruptcy court did not address whether any hypothetical costs of sale should be subtracted. The bankruptcy court also concluded that the unsecured portion of the IRS tax lien was to be eliminated in accordance with the plan, which provided for a release of "any and all liens" upon payment of the secured claim.

The district court reversed the bankruptcy court, holding that the IRS's secured claim should be valued based on the stipulated fair market value of the Debtors' residence. The district court also denied the Debtors' request for a reduction based on hypothetical costs of sale. The court further concluded that the unsecured portion of the IRS's lien "passed through" bankruptcy unaffected by the reorganization plan. For this conclusion, the district court relied on *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (11 U.S.C. § 506(d), which provides that a lien is void "[t]o the extent that [it] secures a claim against the debtor that is not an allowed secured claim," does not allow a Chapter 7 debtor to "strip down" a creditor's undersecured lien to the judicially determined value of the collateral).

## II

The first issue we address is whether the fair market or forced sale value of the Debtors' residence should be used to determine the amount of the IRS's secured claim. To value a secured claim, we must look to 11 U.S.C. § 506(a), which provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.... Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property."

Several courts have pointed out a potential source of tension in section 506(a). On the one hand, the court is to obtain the value of the "creditor's interest." On the other hand, the "purpose of the valuation" and the "proposed disposition or use" of the property is also to be taken into account. *See In re Trimble*, 50 F.3d 530, 531 (8th Cir.1995) (*Trimble*) (discussing how courts have "placed varying importance on [section 506(a)'s] two clauses, resulting in disagreement as to the proper valuation method of a creditor's secured claim").

If we focus solely on the "creditor's interest" in the property, it is tempting to say that that interest is always the amount of money that the property would bring based on a forced sale on the date of the approved plan. After all, a creditor, in order to obtain any value from a secured asset that continues to be used by a debtor, ordinarily must sell it.

However, the several circuits which have considered this issue have all concluded that the fair market value is the proper measure of value when a debtor retains possession of a residence. *See In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 74 (1st Cir.1995) (*Winthrop*) (concluding that the fair market value is the proper standard of valuation where a debtor retains property); *In re Rash*, 31 F.3d 325, 329 (5th Cir.1994) (*Rash*) ("If the debtor retains the property as part of a reorganization, the proper measurement of the estate's interest in the property is the 'going-concern' value of the collateral to the debtor's reorganization."); *see also Trimble*,

50 F.3d at 532 (concluding that the retail value of the collateral is to be used when a debtor retains possession). The reasoning of these cases is persuasive. A debtor who retains possession of a residence might eventually sell it. If so, the secured claims would have to be paid off. But there is no reason to reduce the amount of an already undersecured claim to the forced sale value of the property at the time of the plan's approval, when no forced sale is contemplated. Doing so decreases the creditor's already devalued interest in the property. It is true that the property might have to be sold for the creditor to obtain satisfaction of the secured claim, but where no sale—much less a forced sale—is contemplated, reducing the creditor's lien in the way Debtors suggest would only serve to allow a debtor to capture any future equity in the property at the creditor's expense.

In addition, the legislative history of section 506(a) indicates that: "'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6312. Subsection 506(a) "makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property." *See* S.Rep. No. 989, 95th Cong., 2nd Sess. 68, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5854.

Furthermore, with all of our sister circuits who have considered the issue arriving at the same conclusion, our going a different direction would only create an unnecessary intercircuit conflict. It is for this reason that we have adopted a cautionary rule, counseling against creating intercircuit conflicts. *See United States v. Chavez–Vernaza*, 844 F.2d 1368, 1374 (9th Cir.1987) (*Chavez–Vernaza*), *cert. denied*, —— U.S. ——, 114 S.Ct. 1324, 127 L.Ed.2d 672 (1994).

Debtors point to *In re Mitchell*, 954 F.2d 557 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992), for

contrary authority in this circuit. In *Mitchell*, the assignee of an automobile seller who had financed the debtor's automobile purchase filed a claim as a secured creditor in the debtor's Chapter 13 case. The bankruptcy court valued the secured claim based on the retail value of the automobile. We reversed, holding that the wholesale value, rather than the retail value, generally should apply. This was so even though the debtor was keeping the car. *Id.* at 560. *Mitchell* reasoned that "what is being valued is the creditor's interest in the collateral, not the debtor's interest." *Id.* (internal quotation omitted). The wholesale price "best approximates this value." *Id.*

Debtors press an argument by way of analogy. They suggest that here, as in *Mitchell*, there are two standards, one equivalent to the retail value and one equivalent to the wholesale value. Debtors then read *Mitchell* for the proposition that the value of a non-income producing asset must be valued at the amount the creditor would obtain if the creditor were to make a reasonable disposition of the collateral.

We will not extend *Mitchell* to the facts of this case with a resulting intercircuit conflict. *Mitchell* determined that the wholesale value was the best approximation of a creditor's interest in an automobile. The wholesale value and retail value of an automobile are not the same as the fair market value and forced sale value of a residence. Neither a wholesale nor retail sale is "forced." Rather, the terms "wholesale" and "retail" represent two different fair market values for an automobile. The forced sale value of a residence, by contrast, does not represent a fair market value at all. The fact that the wholesale value is less than the retail value does not indicate that either are the product of anything other than "arms length" transactions involving rational, informed, and willing parties. There is nothing "forced" about either transaction. The Debtors in this case do not explain why the fair market value of their residence, as opposed to the forced sale value, is not the best approximation of the creditor's interest, given that under the plan the property will not be sold at a forced sale. The wholesale value of an automobile might be the best approximation of a creditor's interest in that automobile, but that tells us nothing about what value best approximates the IRS's interest in this case. In our view, it is the fair market value.

### III

■ Having determined that the fair market value is the proper standard of valuation here, we must next decide whether hypothetical costs of sale should be subtracted from the amount of the IRS's allowed secured claim. The costs are hypothetical because the residence is not being sold.

The growing number of circuits to have considered this issue have all concluded that hypothetical costs of sale should not be deducted. *See Trimble*, 50 F.3d at 532 (no reduction of secured claim based on hypothetical costs of sale when debtor retains possession of property) (8th Cir.); *Winthrop*, 50 F.3d at 74 (same) (1st Cir.); *In re McClurkin*, 31 F.3d 401, 405 (6th Cir.1994) (*McClurkin*) (same); *Rash*, 31 F.3d at 329 (same) (5th Cir.); *In re Balbus*, 933 F.2d 246, 252 (4th Cir.1991) (same).

As the Sixth Circuit has explained:

The automatic deduction for "costs of sale" ... proceeds ... from the erroneous assumption that a secured creditor "receives" only the net proceeds from the disposition of the collateral. When a creditor forecloses on the property ... the creditor "receives" *all* of the proceeds of the sale.... There is no basis ... for assuming that the costs of sale are paid with the "first dollar" of the sale proceeds rather than being added to the debtor's deficiency.

The idea of limiting a creditor's "interest" in the collateral to the hypothetical "net" sale proceeds appears also to have been influenced by the Bankruptcy Code's treatment of *over* secured creditors. Under § 506(b), an oversecured creditor ... has a secured claim ... to the extent of the *net* sales proceeds. *See* § 506(c). The treatment of *over* secured creditors, however, is not relevant to determining, and provides no basis for limiting, the *under* secured creditor's interest in the collateral.

*McClurkin*, 31 F.3d at 405 (emphasis in original).

Furthermore, we have concluded once before that it is inappropriate to deduct hypothetical costs of sale from the amount of a secured claim when the debtor retains possession of a residence. *See Lomas Mortgage USA v. Wiese*, 980 F.2d 1279, 1285 (9th Cir. 1992), *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 2925, 124 L.Ed.2d 676 (1993). Although *Lomas* does not bind us, we conclude that its analysis of the issue is persuasive and adopt it. Having once arrived at what we still perceive to be the better rule which was not affected by the Supreme Court's vacatur, it is especially important not to reverse ourselves and create an intercircuit conflict. *See Chavez–Vernaza*, 844 F.2d at 1374; *Orhorhaghe v. INS*, 38 F.3d 488, 493 n. 4 (9th Cir.1994) (vacated opinion is persuasive authority if sound).

Nor does *Mitchell* affect our decision on this issue either. *Mitchell*, as discussed earlier, held only that the wholesale rather than retail value of an automobile was the proper standard to use when fixing the value of a lien on an automobile. Both retail and wholesale prices might contain costs of sale. *Mitchell* did not address whether such costs should be deducted when the debtor retained the automobile. We therefore reaffirm our analysis in *Lomas* and join our sister circuits in holding that where a debtor retains possession of a residence, hypothetical costs of sale should not be deducted when fixing the amount of the allowed secured claim.

## IV

■ Finally, the district court concluded that the IRS's lien should not be reduced to the amount of its allowed secured claim. The court relied on *Dewsnup* for the proposition that the unsecured portion of the IRS's lien could "pass through" bankruptcy unaffected. Regardless of the applicability of *Dewsnup* to a Chapter 11 proceeding, the IRS concedes on appeal that the plan of reorganization served to reduce the lien, and that the plan was binding on the IRS. *See* 11 U.S.C. § 1141(c) (confirmed plan binds "all claims and interests of creditors"). Having failed to object to the confirmation of the plan, the IRS's tax lien should be reduced to the amount of its allowed secured claim. *See Lawrence Tractor Co. v. Gregory*, 705 F.2d 1118, 1121 (9th Cir.1983) (failure to object to plan precludes collateral attack of plan provision). Therefore, the district court, on remand, is to reduce the amount of the IRS lien to reflect only the amount of the allowed secured claim based on the fair market value of the residence without a reduction for hypothetical costs of sale.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

KOZINSKI, Circuit Judge, dissenting:

1. My colleagues adopt a plausible interpretation of 11 U.S.C. § 506(a), but one foreclosed by our earlier opinion in *In re Mitchell*, 954 F.2d 557 (9th Cir.1992). The majority's attempt to distinguish *Mitchell* is unconvincing. The question in *Mitchell* was how to value a security interest in a car. *Mitchell* answered that the "creditor's interest" is "what the creditor would obtain if the creditor were to make a reasonable disposition of the collateral." *Id.* at 560. *Mitchell* rejected the alternate value suggested by the creditor, namely the "replacement cost to the debtor." *Id.*

It's true that *Mitchell* referred to the two values as "wholesale" and "retail," but that was merely a shorthand. *Mitchell* made it clear that by "retail value" it meant the value of the car in the hands of the debtor, and by "wholesale value" it meant what the car would bring the creditor on foreclosure. It chose the wholesale price, not because it was the "fair market value," *cf.* Maj. op. at 309, but because, it "appear[ed] to … best approximate[ ]" the creditor's collection value. *Mitchell*, 954 F.2d at 560.

*Mitchell* construed the same section of the Bankruptcy Code as we, and it rejected exactly the same approach we accept today: In *Mitchell*, as in our case, "[t]he use of the property [was] to be by the debtor." *Id.* at 559–60. The creditor argued, as does the Commissioner here, that "since the debtor intends to use the [property], the value of the creditor's secured interest should be based upon the replacement cost to the debtor."

*Compare id.* at 560, *with* Appellee's Br. at 16–17 (advocating "the price at which the property would change hands between a willing buyer and a willing seller" because "debtor intends to retain the property").

*Mitchell* reached its conclusion over a vigorous dissent. Like the majority today, Judge Noonan protested that the debtor would retain possession and therefore "the cost of providing a similar car" (replacement value) was the only appropriate valuation method under the second sentence of section 506(a). 954 F.2d at 561. The *Mitchell* majority rejected this approach because it values the asset in the hands of the debtor and therefore "ignores the clause of the statute that defines the value of the secured claim as the value of the 'creditor's interest' in the property." *Id.* at 560 (citing James F. Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11*, 92 Com. L.J. 18, 30 (1987)).

*Mitchell* leaves open the possibility of taking the debtor's use of the property into account where it's part of a going concern, or where use by the debtor is either "particularly beneficial" or "particularly detrimental." *Id.* In the ordinary case, however, it holds that the proper valuation is what the creditor would get if it foreclosed on the collateral.

The majority makes much of the fact that the parties here identified what the IRS could get for the property as the "forced sale" value. In my colleagues' view, this distinguishes our case from *Mitchell* because a "forced sale" doesn't yield a "market value." Maj. op. at 309. I don't see the point. Section 506(a) doesn't call for "market value;" the majority pulls that term out of thin air. The statute calls for a determination of the "creditor's interest" in the property. Quite often, what the creditor realizes from the collateral is *not* the market value. This depends a great deal on the type of asset and the nature of the security interest. In *Mitchell*, the asset was a car; the relevant valuation terms were "retail" and "wholesale" because cars, unlike real estate, may be repossessed by the creditor and sold "at wholesale or retail and at any time and place and on any terms, provided the secured party acts in good faith and in a commercially

reasonable manner," Cal.Com.Code § 9504(3). A security interest in real estate, by contrast, can normally be realized only by some sort of forced sale. *See, e.g.,* Harry D. Miller & Marvin B. Starr, *Current Law of California Real Estate* §§ 9:121 *et seq.* (power of sale under a deed of trust), §§ 9:161 *et seq.* (judicial sale) (2d ed.1989); 26 U.S.C. §§ 6331, 6335 (auction after tax seizure). Applying *Mitchell*, the Commissioner's interest in the real estate here is its forced sale value, which is what she could reasonably hope to collect from enforcing her lien.

Were the matter not otherwise clear, one could examine the cases on which the majority relies. All three draw a sharp distinction between the foreclosure or hypothetical sale value (which they reject) and the retained value to the debtor (which they adopt). *See In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72 (1st Cir.1995); *In re Trimble,* 50 F.3d 530, 531 (8th Cir.1995); *In re Rash,* 31 F.3d 325, 328–29 (1994), *modified,* 62 F.3d 685 (5th Cir.1995). This is precisely the division between the majority and the dissent in *Mitchell.* Indeed, *Rash* and *Trimble* specifically mention *Mitchell* and *reject* it. *Rash* goes so far as to rely on Judge Noonan's dissent: "The 'estate's interest in the property' is the ownership and possession of vehicle by the debtor, *see Mitchell,* 954 F.2d at 561 (Noonan, J., dissenting)...." 31 F.2d at 329. *Rash* and *Trimble,* which also involved motor vehicles, used the valuation nomenclature of *Mitchell,* referring to the values in question as wholesale and retail. *Winthrop* cites and rejects the Queenan article which the *Mitchell* majority follows. In short, it is quite impossible to read the cases the majority cites without concluding that they consciously rejected the Ninth Circuit's approach in *Mitchell.* I find it most peculiar for us to go chasing consistency with other circuits when those circuits have already declared themselves in conflict with us.

This is an area where consistency within the law of the circuit matters a great deal because valuation of assets is at the heart of most bankruptcy proceedings. After today, we'll have two separate valuation methods, one for cars and another for homes. How will parties trying to value a multitude of

other assets—from aalii to zwieback—know which rule applies to them?

If my colleagues believe that *Mitchell* was wrongly decided, they can call for en banc. But to dismiss so lightly a prior opinion of this court that addresses the very question we confront today only gives aid and comfort to those who claim the Ninth Circuit cannot or will not maintain the integrity of its case-law.

2. The majority also rejects the Taffis' alternative argument that the value of the IRS' lien should be diminished by the costs of a hypothetical sale that could yield such a value. Its decision not to deduct costs of sale follows from its erroneous resolution of the principal issue. Since the majority measures the IRS' security interest by the value of the property in the debtors' hands (rather than by what it would fetch on foreclosure) it would make no sense to deduct hypothetical costs of sale.

I'm concerned, however, that the majority writes too broadly, as it seems to reject consideration of the costs of sale in all cases, even those involving cars (or car-like assets) that presumably continue to be governed by *Mitchell*. *Mitchell*-like cases *do* contemplate a disposition of the collateral by the creditor; in those circumstances, it becomes relevant to ask what, if anything, the creditor would have to spend to realize on its security. The normal rule is that the costs of a foreclosure sale are paid from any excess proceeds after the secured debt is satisfied—in other words, from the debtor's equity. Cal.Com.Code § 9504(1)(a), (b). But where there is no debtor's equity, the costs of sale perforce are paid by the creditor. A simple example illustrates the point. If a creditor with a $1,000 lien on a car sells the collateral (at a cost of $100) for $1,500 to satisfy the debt, it will be entitled to take its full $1,000 from the proceeds and then deduct the costs of sale from the debtor's remaining $500. If the car brings in only $500, however, the creditor will have to pay the costs of sale out of its own pocket; the net proceeds from foreclosure would be only $400.

Whether the creditor's interest in property should be diminished by the hypothetical costs of sale, then, turns on whether the creditor is oversecured. If the creditor is oversecured in the amount of the sales costs, it will recover the full amount of its lien. If it's oversecured by a lesser amount, or is undersecured, the costs of sale will necessarily diminish what it will take in to satisfy its lien.

Because I disagree with the majority as to the valuation issue, I also come to a contrary conclusion as to the sales costs issue. Here, the IRS had a lien of almost $500,000 against the Taffis' house and personal property. The parties have stipulated that the house is worth no more than $300,000. After taking out senior liens, that leaves the Commissioner about $70,000, so the Commissioner is heavily undersecured. Were there a foreclosure sale, there would be no debtor's equity to cover the sales costs. Accordingly, under *Mitchell*, the Bankruptcy Court should have diminished the value of the IRS' interest by the stipulated $27,000 in sales costs.