In the Matter of Ethel Y.
MADDOX, Debtor.

Bankruptcy No. 95–16118.

United States Bankruptcy Court,
D. New Jersey.

April 18, 1996.

Andrew Vazquez–Schroedinger, David Paul Daniels, P.C., Camden, New Jersey, for Debtor.

Hillary Veldhuis, David R. Lyons, Lyons & Doughty, P.C., Voorhees, New Jersey, for Chrysler Financial Corporation.

### OPINION ON DEBTOR'S MOTION TO REDUCE PROOF OF CLAIM

JUDITH H. WIZMUR, Bankruptcy Judge.

At issue here is the valuation of an automobile owned by the debtor, Ethel Y. Maddox. Chrysler Financial Corporation holds a security interest in the vehicle, and is undersecured. The purpose of the valuation is to determine the amount of Chrysler's allowed secured claim that will be paid through debtor's Chapter 13 cram down plan.

### FACTS

Debtor, Ethel Y. Maddox, filed a petition for relief under Chapter 13 of the Bankruptcy Code on October 19, 1995. Debtor owns a 1994 Dodge Caravan, financed by Chrysler Financial Corporation.[1] In her Chapter 13 plan, debtor proposes to reduce Chrysler's secured claim to $11,875, the N.A.D.A.[2] wholesale value, and to pay the claim over 60 months, with interest at the contract rate.

1. The original secured party, Chrysler Credit Corporation, was succeeded by merger with Chrysler Financial Corporation.

2. Eastern Edition National Auto Dealers' Association Used Car Guide for October 1995.

Chrysler's proof of claim, as amended, asserts a secured claim in the amount of $14,325.00, representing the vehicle's retail valuation, payable with interest over the life of the plan.[3] The unsecured portion of Chrysler's claim is $4,635.44. Debtor's plan provides for a zero dividend to unsecured creditors.

Chrysler objects to confirmation of debtor's plan. Debtor objects to Chrysler's proof of claim, seeking by motion to reduce the secured claim to the average trade-in or wholesale value of the vehicle.

## DISCUSSION

The parties appear to agree on various issues, including the applicability of the contract interest rate of 10.60% for present value purposes,[4] the valuation of the automobile as of the petition date,[5] and the use of the N.A.D.A. Used Car Guide as an appropriate reference for valuation. According to the parties, the only issue to be resolved in this case is the appropriate valuation column to be utilized from the N.A.D.A. Used Car Guide.

## I

In a Chapter 13 proceeding, the court must confirm a plan, even over the objection of a secured creditor, if the plan provides that the secured creditor will retain its lien, and "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such [secured] claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii).[6] *See, e.g., General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 66 (3d Cir.1993). "[T]he secured creditors' lien only secures the value of the collateral and to the extent property is distributed of a present value equal to the allowed amount of the creditor's secured claim the creditor's lien will have been satisfied in full. Thus the lien created under section 1325(a)(5)(B)(i) is effective only to secure deferred payments to the extent of the amount of the allowed secured claim." 124 Cong. Rec. H11047, H11107 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17403, S17423 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini.

The allowed amount of the creditor's secured claim is determined by reference to section 506(a), which provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the pro-

3. The parties agreed at oral argument that the service warranty contracted for by the debtor, at a cost of $537.50, does not constitute a part of Chrysler's secured claim. Debtor will subsequently determine whether she will assume the contract. If so, she will make provision for it in her plan. *See In re Mitchell*, 954 F.2d 557, 561 (9th Cir.1992), *In re Dews*, 191 B.R. 86, 91 (Bankr.E.D.Va.1995).

4. See, *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 70–71 (3d Cir.1993).

5. Although neither party presents the issue, we note that a question may be raised regarding the correct date of valuation of collateral for purposes of a Chapter 13 plan. *See Rake v. Wade*, 508 U.S. 464, 469–71, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424 (1993) (the property distributed "must equal the present dollar value of such claim as of the confirmation date").

6. Section 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

    .    .    .    .    .

(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;
(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder.
11 U.S.C. § 1325(a)(5).

posed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a). *See Nobelman v. American Sav. Bank,* 508 U.S. 324, 328 n. 3, 113 S.Ct. 2106, 2109 n. 3, 124 L.Ed.2d 228 (1993) (§ 506(a) applies generally to cases under Chapter 13); 11 U.S.C. § 103(a). Chrysler's claim is secured to the extent of the value of the collateral, and unsecured to the extent that the claim exceeds the value of the collateral.

Section 506(a) does not fix the measurement of "value." Rather, we are instructed that the value of the collateral must be determined "in light of the purpose of the valuation" and in light of "the proposed disposition or use of such property." 11 U.S.C. § 506(a). " 'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts ... have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6312.

Case law on the appropriate method of vehicle valuation in a Chapter 13 cram down plan appears to be divided into three groups: those favoring use of the wholesale value, those favoring use of the retail value, and those using an average of the retail and wholesale values.[7]

1. *Wholesale Valuation:*

In *In re Mitchell,* 954 F.2d 557 (9th Cir.), *cert. denied* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992), the first circuit court decision to address this issue, the court agreed with "the vast majority of reported bankruptcy court decisions" to date that "the wholesale price ... best approximates" the value that "the creditor would obtain if the

creditor were to make a reasonable disposition of the collateral." *Id.* at 560. The court rejected the replacement cost to the debtor as the appropriate determinant of value, noting that " 'what is being valued [under § 506(a)] is the creditor's "interest" in the collateral, not the debtor's interest.' " *Id.* (quoting JAMES F. QUEENAN, JR., *Standards for Valuation of Security Interests in Chapter 11,* 92 COM.L.J. 19, 30 (1987)).

The *Mitchell* court recognized that use of the wholesale value as a rule of practice would be affected by case-by-case variables in a cram down situation, as where use of the collateral is particularly beneficial or detrimental to its value. *Id.* Citing *United Savings Ass'n v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) to juxtapose value in the hands of the creditor versus value based on the replacement cost to the debtor, the *Mitchell* court opined that *Timbers* would focus on the former, since "*Timbers* measures the value of the creditor's interest as if the collateral were in the hands of the creditor." *Id.*

Other courts which have utilized the wholesale value include: *In re Malody,* 102 B.R. 745 (9th Cir. BAP 1989) (adopts wholesale value since retail value affords the creditor a premium and penalizes the debtor); *In re Grubbs,* 114 B.R. 450, 451 (D.S.D.1990) ("the secured claims of the creditors here would normally be assigned wholesale value because they are not in the business of selling at retail and there is no evidence that they have the capacity to do so"); *In re Ferguson,* 149 B.R. 625 (Bankr.D.Idaho 1993) (the starting point is the wholesale value); *In re Rossow,* 147 B.R. 1 (Bankr.W.D.N.Y.1992) (N.A.D.A. average trade-in value is prima facie evidence of value); *In re Phillips,* 142 B.R. 15 (Bankr.D.N.H.1992) (secured creditor will likely dispose of car through auction which reflects the wholesale value); *In re Owens,* 120 B.R. 487 (Bankr.E.D.Ark.1990) (the value of the collateral is the value the

7. *See also Barash v. Public Finance Corp.,* 658 F.2d 504, 512 (7th Cir.1981) (Chapter 7 preferential transfer case where the court found that the "choice of values is not restricted to NADA wholesale or retail, but depends on the facts and circumstances of each case"); *In re Johnson,* 165

B.R. 524 (S.D.Ga.1994) (declining to follow any of the three lines of cases preferring instead to look to the property's "fair market value" based upon the totality of the relevant evidence, which may include N.A.D.A. values).

secured creditor could realize after foreclosure and disposition in a "commercially reasonable manner"); *In re Cook,* 38 B.R. 870, 873 (Bankr.D.Utah 1984) ("The purpose of collateral valuation under Section 1325(a)(5)(B)(ii) is not to assure that secured claimants will receive under the plan as much money as debtors would have to spend to replace the collateral. Instead, the purpose ... is to protect secured claimants from loss by assuring that they will receive under the plan as much money, or its equivalent, as they would receive if they were permitted to sell the collateral in a commercially reasonable manner.").

### 2. *Retail Valuation:*

The Fifth Circuit in *In re Rash,* 31 F.3d 325 (5th Cir.1994), *reh'g denied, opin. modified by* 62 F.3d 685 (5th Cir.), *reh'g granted en banc* 68 F.3d 113 (5th Cir.1995) adopted the retail value or "replacement model" approach in determining the value of collateral that the debtor proposes to retain under her Chapter 13 plan.

The *Rash* court noted that valuation cases construing § 506(a) have generally focused upon either the first sentence or the second sentence of the section. Describing *In re Mitchell* as a first sentence case, the court opined that " '[i]f the first sentence of § 506(a) were interpreted to mean that the value must be fixed at the amount which the creditor would receive on foreclosure, then the last sentence of the statute which provides that the value should be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, would be surplusage.' " *Id.* at 329 (quoting *In re Courtright,* 57 B.R. 495, 497 (Bankr.D.Or.1986)). Only the replacement cost approach "gives full effect to the language of § 506(a)." *Id.* "[B]ecause the reorganizing debtor proposed to retain and use the collateral, it should not be valued as if it were being liquidated; rather, courts should value the collateral 'in light of' the debtor's proposal to retain it and ascribe to it its going-concern or fair market value." 62 F.3d at 686 (quoting *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 74 (1st Cir. 1995)).

As to the first sentence of § 506(a), establishing the creditor's secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property," the court concluded that "[t]he 'estate's interest in the property' is the ownership and possession of the vehicle by the debtor, and thus the creditor's interest is derivatively defined by the value of the debtor's interest in the property." 31 F.3d at 329 (citations omitted). Where the debtor seeks to retain possession of the collateral as part of her reorganization, "the proper measurement of the estate's interest in the property is the 'going-concern' value of the collateral to the debtor's reorganization." *Id.*

Other courts holding that retail value is the proper measurement for purposes of determining the allowed amount of an undersecured creditor's secured claim in a Chapter 13 case include: *In re Trimble,* 50 F.3d 530, 532 (8th Cir.1995) ("the purpose of the valuation is to determine the amount an undersecured creditor will be paid for the debtor's continued possession and use of the collateral, not to determine the amount such creditor would receive if it hypothetically had to repossess and sell the collateral. Such an interpretation ignores the express dictates of section 506(a)"); *In re Dews,* 191 B.R. 86 (Bankr.E.D.Va.1995) (court looks to debtor's actual use of the collateral and if the use is retention, the retail value should be used); *In re Coates,* 180 B.R. 110 (Bankr.D.S.C. 1995) (where the debtor seeks to retain the vehicle, the appropriate standard is the retail value); *In re Arnette,* 156 B.R. 366 (Bankr. D.Conn.1993) (where the debtor seeks to retain the collateral they cannot insist upon a liquidation value for the creditor); *In re Green,* 151 B.R. 501, 505 (Bankr.D.Minn. 1993) ("a hypothetical sale ignores the purpose of the valuation which is to determine the amount an undersecured creditor will be paid for the debtor's continued possession and use of the collateral, not to determine the amount such creditor would receive if it had to repossess and sell the collateral"); *In re Johnson,* 145 B.R. 108 (Bankr.S.D.Ga. 1992) (where debtor retains collateral, retail

value is proper standard).[8]

### 3. *Average of Wholesale and Retail Values:*

Some courts have averaged the retail and wholesale values to establish the cram down value of the vehicle, reasoning that the wholesale value alone ignores the creditor's risks and the retail value alone forces the debtor to pay more than the creditor could have received after repossession and immediate sale. *In re Stauffer,* 141 B.R. 612 (Bankr.N.D.Ohio 1992). These courts reason that averaging the retail and wholesale values provides "courts with the flexibility required in order to give meaning, to the extent possible, to both the first and second sentences of § 506(a)." *In re Myers,* 178 B.R. 518, 524 (Bankr.W.D.Okl.1995). "Even though it may be argued that that position provides creditors with somewhat more than they could be expected to realize from an immediate liquidation of the collateral, ... it represents a compromise which in a vast majority of cases will provide an equitable result." *Id. See, e.g., General Motors Acceptance Corp. v. Valenti,* 191 B.R. 521 (N.D.N.Y.1995) (use of the average of the wholesale and retail values is dictated by local rule); *In re Mitchell,* 191 B.R. 957 (Bankr.M.D.Ga.1995) (begins with average of wholesale and retail which gives court the flexibility to give meaning to both sentences in 506(a)); *In re Madison,* 186 B.R. 182 (Bankr.E.D.Pa.1995) (cases advocating retail valuation overemphasize the second sentence of 506(a)); *In re Hoskins,* 183 B.R. 166 (Bankr.S.D.Ind.1995) (average value was appropriate under particular facts of the case); *In re Carlan,* 157 B.R. 324 (Bankr.S.D.Tex. 1993) (the starting point is the average between the book wholesale and retail values); *In re Thayer,* 98 B.R. 748 (Bankr.W.D.Va. 1989).

### II

■ In attempting to synthesize the various reflections on the proper valuation standard to utilize in a Chapter 13 cram

down, we underscore that any reading of § 506(a) must give effect to every provision of the statute, and must avoid rendering any part of the statute inoperative. *In re Madison,* 186 B.R. at 184 (citing *United States v. Nordic Village, Inc.,* 503 U.S. 30, 34–36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992)). We conclude that the wholesale value is the appropriate measurement for collateral valuation, absent a showing otherwise. Our conclusion gives effect to every provision of the statute.

The first sentence of section 506(a) provides that the allowed claim of a creditor is a secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property." In *Rash,* this language was read to mean that "the creditor's interest is derivatively defined by the value of the debtor's interest in the property." 31 F.3d at 329. Another interpretation, explained in Collier on Bankruptcy and noted in Judge Parker's dissent to the Fifth Circuit opinion denying a panel rehearing in *Rash,* reflects that:

> the "estate's interest" language is designed to prompt a determination of "whether the estate actually has an interest in the collateral," and to prompt an examination of the nature of the estate's interest in the collateral. *See* 3 Lawrence P. King, *Collier on Bankruptcy* para. 506.04, at 506–17 to –19 (15th ed. 1994) ... Thus, the key purpose of the "in the estate's interest" language is to point out that the value of the estate's interest may differ from the value of the collateral.

62 F.3d at 689. By way of illustration, the estate's interest in the collateral may be of a nature other than an ownership interest, the debtor may not be the sole owner, or the estate's interest in the collateral may be conditioned in some way. *Id.*

■ To determine the value of the creditor's interest in the collateral, we must determine, as a starting point, the nature of the estate's interest in the collateral. In this

---

8. *See also In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72 (1st Cir.1995) (favors fair market value in a Chapter 11 reorganization over a hypothetical foreclosure sale when debtor proposes to retain and use collateral); *In re McClur-* kin, 31 F.3d 401, 404 (6th Cir.1994) (concluding that hypothetical costs of sale should not be deducted because the property is not being disposed); *In re Balbus,* 933 F.2d 246, 251 (4th Cir.1991) (same).

respect, the *Rash* formulation that the creditor's interest is "derivatively defined" by the value of the debtor's interest in property is consistent. However, the "critical focus of the valuation question" is not the debtor's interest. Rather, the focus is on the measurement of the creditor's interest in ascertaining the amount of its allowed secured claim. "Thus, § 506(a) clearly requires us to determine the value of the collateral from the creditor's perspective, and the panel opinion's valuation [in *Rash*] of the retained asset based on the debtor's perspective is misplaced." *Id.*

■ The second sentence of § 506(a) requires us to determine value "in light of the purpose of the valuation." The purpose of the valuation here is to determine whether debtor's plan, providing for payment of the wholesale value of the vehicle plus interest over the life of the plan, may be confirmed under § 1325(a). Under § 1325(a)(5), in the absence of a secured creditor's consent, the two alternatives for treatment of an allowed secured claim, presented as equivalent methods of protecting the secured creditor's interest, include retention by the secured creditor of its lien and payment of present value over the life of the plan, or return of the collateral to the secured creditor. Therefore, "[t]he purpose of determining the present value of the collateral, and thus the secured claim, is to see to it that the creditor will receive as much money under the plan, per § 1325(a)(5)(B), as the creditor would receive were it permitted to sell the collateral in a commercially reasonable manner." *Id.* at 688.

■ The second sentence also requires us to consider the "proposed disposition or use of such property." The *Rash* decision and its progeny emphasize the debtor's intention, in plans such as the one presented here, to retain the collateral, opining that the purpose of the valuation is to determine the amount an undersecured creditor will be paid for the continued possession and use of the collateral by the debtor, not to determine what the creditor would receive if it had to repossess and sell the collateral. However, debtor's retention and use of the collateral is relevant only to the extent that such continued use impacts upon the value of the creditor's interest in the collateral.

In other words, disposition or use is considered because of the effect it could have on the intrinsic value of the collateral, and thus on the value of the property by which the debt is secured. To the extent the property is used for its intended purpose and is properly insured and maintained, the debtor's use of the property, under a Chapter 13 plan, should not affect its valuation. The debtor's use of the property should be a consideration only to the extent that it represents an increased risk to the creditor's security.

*Id.* at 688–89.

■ For instance, as suggested in *Mitchell,* debtor's use of the collateral may impact on valuation where such use is "particularly beneficial," i.e., where the collateral is more profitable in debtor's hands than otherwise, or "particularly detrimental", as where the debtor uses the collateral 24 hours a day and causes rapid depreciation. 954 F.2d at 560 (citing JAMES E. QUEENAN, JR., *Standards for Valuation of Security Interests in Chapter 11,* 92 Com.L.J. 19, 37 (1987)). Where, as here, a debtor's proposed retention of a motor vehicle involves normal consumer use, depreciation of the vehicle may be balanced by insurance, maintenance, and regular plan payments by the debtor toward satisfaction of the secured claim.

### III

Our reading of § 1325(a)(5)(B) and § 506(a) finds support in additional sources. In *United Savings Ass'n of Texas v. Timbers of Inwood Forrest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court, addressing the meaning of the clause "interest in property" under 11 U.S.C. § 362(d)(1), to determine whether undersecured creditors are entitled to compensation for the delay caused by the automatic stay in foreclosing on their collateral, drew analogy to the language of § 506(a) valuing a "creditor's interest" in property. The Court rejected the undersecured creditor's argument that debtor's use of the collateral during the term of the automatic stay required

reimbursement to the undersecured creditor. In addressing the analogous section of § 506(a), the court noted that:

> In subsection (a) of this provision the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues—since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time. No one suggests this was intended. The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral."

484 U.S. at 372, 108 S.Ct. at 631. (citations omitted).

The Court appears to reject the concept that a debtor's use of collateral from the date of the filing of a bankruptcy petition should cause the value of a creditor's interest to increase. Rather, the excerpt implies that "the value of such creditor's interest" means the value of the creditor's interest "as if the collateral were collateral in the hands of the creditor." *In re Mitchell,* 954 F.2d at 560–61. *But see Id.* at 562 (Noonan, C.J., dissenting) (Under *Timbers,* the debtor's use of the collateral, rather than the creditor's right to foreclose, controls the value of the security interest).

The decision of the Third Circuit in *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir.1993) is also relevant here. In *Jones,* the Chapter 13 debtor's plan proposed to reduce the secured creditor's claim both as to amount and as to interest rate, to retain possession of the vehicle, and to continue payments over the term of the plan. The secured creditor objected to the reduced interest rate proposed for present value purposes under 11 U.S.C. § 1325(a)(5)(B)(ii). The court considered the purpose of the cram down provision, noting that:

> § 1325(a)(5)(B)(ii) . . . seeks to put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured

amount immediately, thus terminating the relationship between the creditor and the debtor.

999 F.2d at 66–67. To place the creditor "in approximately the same position it would have occupied had it been able simply to repossess the collateral at the time of the bankruptcy," *Id.* at 68, the court adopted "the model of a coerced loan," reflecting that, by operation of § 1325(a)(5)(B), the secured creditor is actually coerced to extend new credit to the debtor. Under the "coerced loan" model, *Jones* determined that a Chapter 13 cram down plan requires compensation to the secured creditor in the form of interest over the term of the plan "at the rate it would voluntarily accept for a loan of similar character, amount and duration [such] that the creditor can be placed in the same position he would have been in but for the cramdown." *Id.* at 67.

The *Jones* court recognized that under a Chapter 13 cram down plan, a secured creditor is required to forego not only its right to repossession and disposition of the collateral, but also the use of the funds generated from that disposition during the term of the plan. For the purpose of determining the appropriate interest rate to compensate the secured creditor for this loss, the coerced loan theory addresses the latter, not by presupposing a new sale to the debtor for the value of the car to the debtor, but by recognizing that the creditor is actually forced to extend new credit to the debtor in the amount that the creditor would have realized had there been an opportunity to repossess and liquidate the collateral. The rate of interest the creditor would charge for a new loan of similar character, amount and duration best protects the creditor's interest over the life of the plan. The amount of the "loan" is the value of the money to the creditor, not what the debtor would pay to obtain the loan or to obtain the same vehicle in the retail market.

The natural extension of the conceptual framework of *Jones,* under § 1325(a)(5)(B), to place the creditor in the same position as it would have been had it been able to repossess the collateral at the time of the bankruptcy filing, is to assign the N.A.D.A.

wholesale value to the vehicle for cram down purposes, barring an evidentiary showing that another value is more appropriate under the facts of a particular case. It is generally recognized that the wholesale price best approximates what the creditor would obtain if the creditor were to make a commercially reasonable disposition of the collateral. *In re Mitchell*, 954 F.2d at 560.

As a policy matter, we recognize that commercial lenders incorporate in each transaction the inherent risk of default, repossession, and disposition of collateral at less than retail value. "[A]llowing a secured claim in an amount greater than the creditor's potential recovery on repossession and sale is granting the creditor more protection than that for which it bargained." *In re Rash*, 62 F.3d at 688. Judge Lundin has commented in this regard:

> Since when have creditors in bankruptcy (or outside) credited debtors with "retail value" when a car is repossessed or surrendered? Lenders and sellers build the risk of default and the risk of bankruptcy into the interest rates they charge, the prices at which they sell, and the transaction costs that they charge. To allow sellers and financiers to recover the retail or replacement cost of personal property in Chapter 13 cases is to twice compensate for the risk of nonpayment. Lienholders in Chapter 13 cases are already guaranteed "present value" at confirmation under § 1325(a)(5)(B)(ii). Chapter 13 is supposed to be a rehabilitative chapter, favored by Congress over other forms of consumer bankruptcy. This purpose is lost entirely in the Fifth Circuit's analysis of §§ 506(a) and 1325(a)(5).

KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY, "Methods of Valuation" § 5.48 at 5–134 as amended (2d Ed.1994 and 1995 Supp.).

In sum, to determine the amount of the creditor's secured claim, we view the issue of vehicle valuation from the creditor's perspective. The purpose of the valuation is to place the creditor in approximately the same position it would have occupied had it been able to exercise its right to repossess the collateral absent the bankruptcy filing. As a rule of practice, we conclude that the wholesale value will control as the appropriate measurement for vehicle valuation. Upon appropriate evidentiary showing, however, this measurement of value may be adjusted in a particular case. For instance, a creditor may show that upon repossession and sale, it can achieve a greater return than the wholesale value for the vehicle as indicated in the N.A.D.A. book, or that the debtor's anticipated use of the vehicle will be particularly beneficial or detrimental to the value of the vehicle.

The parties in this case are offered the opportunity to present evidence to modify the final valuation at the wholesale value.