**In re Jarrette A. & Kathy E. DEWS.**

**Bankruptcy No. 95–41102.**

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

Oct. 25, 1995.

---

Richard G. Poinsett, Hampton, VA, for debtors.

M. Richard Epps, Virginia Beach, VA.

Frank J. Santoro, Trustee, Portsmouth, VA.

## MEMORANDUM OPINION

DAVID H. ADAMS, Bankruptcy Judge.

This matter comes before the Court on Chrysler Credit Corporation's ("Chrysler") Objection to Confirmation of the Chapter 13 plan proposed by Jarrette and Kathy Dews ("debtors"). The parties have asked the Court to establish a standard or standards for the valuation of a motor vehicle retained by a Chapter 13 debtor who agrees, as is required, to pay the secured creditor "the value" of the collateral through the Chapter 13 plan.

## BACKGROUND

Chrysler has a secured claim, as of the date of the filing of the Chapter 13 plan, for $15,472.81 with the debtor's 1994 Plymouth Van serving as collateral. The Chapter 13 plan proposed by the debtors values the vehicle at $13,000 and by its terms will not provide any payments to be made to Chrysler until approximately eight months after confirmation.[1] Chrysler points to the $15,-425.00 retail value reported in National Automobile Dealers Association ("NADA") Used Car Guide ("Guide") for June, 1995 as being the appropriate value. The NADA Guide covers the month of the filing of the plan by the debtors, who filed the same on June 19, 1995. At the very least, Chrysler asserts that proper value would be the average between the retail and wholesale prices reported in NADA Guide.[2]

It is also argued by Chrysler that the current rebate value of the vehicle's Extended Service Warranty should be added to the value of the collateral or, alternatively, Chrysler should be allowed to cancel the warranty and apply the rebated premium to the secured portion of its claim, pursuant to the terms of its contract with the debtors.

The debtor argues that the proper formula for valuation of the automobile in question is to begin with the wholesale value and make some upward adjustment based on the debtor's retention of the vehicle. The debtors curiously did not urge the Court to accept the figure placed on the vehicle by the court evaluator as the value of the automobile for the purpose of determining the extent of the creditor's secured claim in the Chapter 13 context.

Under the terms of the proposed plan, Chrysler will be forced to wait eight months before it receives any distributions. The debtors intend to pay $3,050.00 in mortgage arrears and $675.00 in priority attorney's fees before commencing payments to Chrysler. Due to this lengthy delay, Chrysler contends that it is not adequately protected under the plan because the van will depreciate at a rate in excess of $200.00 per month.[3] Therefore, Chrysler argues that it should receive adequate protection payments equal to the projected rate of depreciation until such time as it begins to receive distributions under the plan.

The relevant facts are not in dispute; it is the treatment of the available facts under the proper law to be applied that causes the parties' concern.

## CONCLUSIONS OF LAW

■ There is a great deal of debate as to the proper standard of valuation to be used in the context of Chapter 13 plan confirmations. For the reasons stated herein, this Court believes that the proper valuation of the motor vehicle that serves as collateral under the circumstances, i.e. in the context of a Chapter 13 plan when the debtors retain the collateral, is the fair market value of the vehicle. In this context, the fair market value is the retail value of the vehicle, adjusted *if required under the circumstances*, which is the proper standard of valuation in Chapter 13 plan confirmations. This is a commonly contested issue and one that the

---

1. The debtors had the property evaluated by E.C. Lumpkin, the Court Evaluator, on July 31, 1995. Mr. Lumpkin placed the value at $12,000.00.

2. The wholesale value reported in NADA for June, 1995 is $12,875.00. The average value would therefore be $14,150.00.

3. The Objection filed by counsel for Chrysler puts depreciation at $229.00 per month. However, the letter brief submitted by counsel for Chrysler states that the exact amount of depreciation is unknown, but is in excess of $1,600.00 over an eight month span.

Court feels requires clarification in order to reduce future litigation. After reviewing the arguments for and against the various methods of valuation and the split of the applicable law, we hold that retail value is the standard most consistent with 11 U.S.C. § 506(a) and recent decisions of the Fourth Circuit Court of Appeals.

This particular issue arises under 11 U.S.C. § 1325(a)(5)(B)(ii), but its resolution hinges on the interpretation of 11 U.S.C. § 506(a) which provides in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The legislative history indicates that the concept of value intended by Congress did not necessarily mean forced sale or liquidation value nor did it always imply full going concern value or retail value. Courts are left with the task of determining value on a case by case basis, taking into account the facts of each case and the competing interests. H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6312. The legislative history also states that "[w]hile courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property." S.Rep. No. 989, 95th Cong., 1st Sess. 68, *reprinted* in 1978 U.S.C.C.A.N. 5787, 5854.

The current debate within the legal community focuses on how the first and second sentences of § 506(a) fit together for the purpose of arriving at value. The compelling question is should "creditor's interest" in the first sentence or "proposed disposition or use" in the second sentence be the controlling language. Two Fourth Circuit cases have interpreted 506(a) in such a way that emphasis is placed on the second sentence, i.e. the proposed disposition or use of the property in question. See *Brown & Co. Securities Corp. v. Balbus (In re Balbus)*, 933 F.2d 246 (4th Cir.1991); *Coker v. Sovran Equity Mortgage Corp. (In re Coker)*, 973 F.2d 258 (4th Cir.1992).

In *Balbus*, a secured creditor contended that hypothetical costs of sale should be deducted when calculating the value of the debtor's real property. The issue arose because if such costs were deducted, the debtor would not have been eligible for Chapter 13 relief. *Balbus*, 933 F.2d at 247. "In construing a statute we are obliged to give effect, if possible, to every word Congress used." *Id.* at 251 (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979)). The second sentence of 506(a) expressly directs that value is to be determined "in light of the purpose of the valuation and proposed disposition or use of such property." 11 U.S.C. § 506(a). To accept the view that wholesale value of the vehicle is the correct standard, would be to read the second sentence out of the statute. *Balbus*, 933 F.2d at 251.

In *Coker*, the debtors sought to avoid a junior deed of trust on real estate on the grounds that it was unsecured. *Coker*, 973 F.2d at 259. The court held that hypothetical costs of sale should not be deducted in arriving at the value of the property. *Id.* at 260. The court reasoned that it would create an anomalous situation if hypothetical sale costs were deducted in spite of the stated intention of the debtors to retain the property. *Id.* at 260. In the present case, as in *Coker*, the debtors propose to continue to retain the automobile. If the court values the secured parties' claim at wholesale, it will be valuing the claim "as if the very event [loss of the use of the vehicle] that Chapter 13 permits them to avoid has occurred." *Id.* at 260. In most, if not all, Chapter 13 cases the debtors attempt to retain an automobile and propose to pay the secured creditor "the value" of the vehicle, which is almost always less than the outstanding balance due on the creditor's secured loan.

While not factually similar to the case at bar, the reasoning in *Balbus* and *Coker* is persuasive and we are of the opinion that the Fourth Circuit would continue to affirm its earlier reasoning if presented with the same issue that now confronts this Court. See *In re Coates*, 180 B.R. 110, 116–117 (Bankr. D.S.C.1995) ("It appears that the Fourth Circuit in *Balbus* and *Coker* has directed this Court to a standard for valuation based upon the perspective of the proposed *use* of the collateral by the debtors and not upon the perspective of the creditor in recovering the collateral.").

The Circuits that have dealt squarely with this issue are split, but the recent trend appears to be in favor of using the retail value standard. See *In re Rash*, 31 F.3d 325 (5th Cir.1994) (replacement cost based on the retail value of the collateral is the proper standard) *reh'g denied* 62 F.3d 685 (5th Cir. 1995) *and reh'g en banc granted* 68 F.3d 113 (5th Cir.1995); *In re Trimble*, 50 F.3d 530 (8th Cir.1995) (amount of secured claim should be lesser of principal balance of debt or retail value); But See *In re Mitchell*, 954 F.2d 557 (9th Cir.1992) *cert. denied* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992) (wholesale value is appropriate standard). In the *Rash* decision, the Fifth Circuit used a replacement cost approach based on the retail value of the vehicle since that is what it would cost the debtor to replace the vehicle. *Rash*, 31 F.3d at 329. The court viewed this approach as the only one giving full effect to the language of § 506. The value to the debtor of retaining and using the property is best measured by the cost of purchasing another vehicle; hence, the fair market or retail value. This valuation accounts for the debtor's proposed retention and use of the property, whereas the foreclosure or liquidation value would not. *Id.* at 329.

The Eighth Circuit has very recently held that under § 506(a) the value of a secured claim of a vehicle under Chapter 13 plan is the lesser of the principal balance of the debt or the collateral's retail value. *Trimble*, 50 F.3d at 532. In so holding, the court stated that "where a debtor intends to retain and use the collateral, the purpose of the valuation is to determine the amount an underse-

cured creditor will be paid for the debtor's continued possession and use of the collateral, not to determine the amount such creditor would receive if it hypothetically had to repossess and sell the collateral" because that would ignore the express language of 506(a). *Id.* at 532.

We also look to the reasoning in *Timbers* where the Supreme Court construed the phrase 'interest in property' in § 506(a) to mean a creditor's "security interest without taking account of his right to immediate possession of the collateral on default". *United Sav. Ass'n. v. Timbers of Inwood Forest Assocs, Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988). This leads to the conclusion that the interest protected under § 506(a) is the security interest itself, which is the right to have the collateral applied in satisfaction of the debt. The right to immediate possession of the collateral is not the interest that is protected. *Rash*, 31 F.3d at 331. The key to valuation in this type of case is the fact that no disposition of the collateral is to take place under the plan. This fact impacts upon exactly where the value of the creditor's lien is derived from. "Where the debtor proposes to retain and use the collateral, and the purpose of the valuation is to determine the amount that an undersecured creditor will be paid on its secured claim under the debtor's plan, the value of the creditor's lien is derived from the stream of payments that the lien secures, rather than the right to foreclose, since no liquidation of the collateral is contemplated." *In re Green*, 151 B.R. 501, 504 (Bankr. D.Minn.1993). By looking at what the nature of the value of the creditor's lien actually is, effect is given to "creditor's interest" referred to in the first sentence of § 506(a) while taking account of the second sentence as well.

The Ninth Circuit in *In re Mitchell* took the position that wholesale value is the appropriate method of valuation. The *Mitchell* Court suggested that replacement cost might be appropriate where the collateral is being used as part of a going concern. The Ninth Circuit also appears to accept the idea that the debtor's use might be a factor where that use is "particularly beneficial" or "particular-

ly detrimental". *Mitchell,* 954 F.2d at 560. The Ninth Circuit's approach seems to ignore the fact that the debtor who retains the collateral is also using it, even in the "going concern" context of a reorganization proceeding. The dissenting opinion of Judge Noonan points out that "[t]here is no better way of arriving at its [the car] value 'in light of . . . its proposed use' than to determine the cost of providing a similar car". *Mitchell,* 954 F.2d at 561.

 This Court agrees with the line of cases that hold that to be faithful to the meaning of the statute, the debtor's actual, not hypothetical, use of the collateral must be considered. Wholesale value contemplates a deduction of the costs to the seller of the disposing of the property, when in cases such as the one before us no such disposition is contemplated. If disposition of the collateral is not contemplated, the wholesale valuation standard is inappropriate.

The standard set forth in *In re Jones,* 5 B.R. 736 (Bankr.E.D.Va.1980) has been the rule in this Court for many years. In *Jones,* the court held that the open market between private parties was the appropriate reference point to establish value. This Court then felt that a commercially reasonable sale did not reflect either the costs of the sale or a summary disposition of the property. *Id.* at 738. The standard enunciated in *Jones* has worked out in practice before this Court to generally mean that a value somewhere around the average of the wholesale and retail values is appropriate.

 It was stated by the court in *Jones* that value is a flexible concept. *Jones,* 5 B.R. at 738. While we do not dispute that assertion, the statute dictates that the method of arriving at value be flexible. Namely, the proposed use and disposition of the collateral is the benchmark to determine value. When a debtor seeks to "retain property

subject to a security interest held by a creditor, the most commercially reasonable manner of valuation is the retail value." *Coates,* 180 B.R. at 117. We note that *Jones* was decided well before *Balbus* and *Coker,* and we respectfully decline to adopt that means of arriving at the appropriate value of a vehicle retained by Chapter 13 debtors.

 Retail value may be established by reference to the NADA Guide which is a generally recognized authority in the Commonwealth and in this Court. This is an objective source to determine value. However, the Court may consider other credible evidence when determining value, such as an evaluation or an appraisal. Often, a visual evaluation of the vehicle in question may be critical if special conditions exist, such as if the vehicle is not in good condition or contains special equipment that might have a bearing on its fair market value, even though there is some consideration of these factors in the NADA Guide.

 We also address the issue of how the Extended Service Warranty should be dealt with in regard to valuation. The terms of the retail installment contract purports to grant a security interest in proceeds, rebates, or refunds from service contract charges financed if such contract is canceled or terminated.[4] Virginia law is not clear on granting of security interests in extended service warranties and the parties have only very briefly touched upon this precise issue in oral argument and the briefs submitted. The wording of the contract clearly indicates an attempt to grant a security interest in any proceeds, refunds, or rebates resulting from a canceled or terminated policy. We do not see from the language of the installment sales contract that Chrysler has any claim to a security interest in the extended service warranty contract itself.[5] We therefore decline to find

---

4. The contact reads as follows: **Security Interest.** You grant to Creditor a security interest in the Vehicle being purchased, including any accessories, equipment and replacement parts installed in the Vehicle, and the proceeds thereof. You also grant to Creditor a security interest in and agree to assignment of any money received by Creditor as proceeds, rebate or refund of, credit insurance premiums or service contract charges financed in this contract due to cancellation or termination. You further agree that any such money received may be applied by Creditor to the unpaid balance of this contract.

5. We therefore express no opinion as to whether or not such a security interest may be granted under Virginia law.

that the value of the contract is an enhancement of the overall value of the vehicle.[6] If the parties wish to cancel the extended service warranty contract, then Chrysler is entitled to any proceeds, refund, or rebates therefrom as a credit to the secured portion of the debt owed by the debtors to Chrysler. During oral argument the debtors indicated an intention to cancel the subject Extended Service Warranty, and if they do, Chrysler can retain the refund of the unearned portion of the warranty payment.

The final question is whether or not the debtors should be required to make adequate protection payments to Chrysler in order to compensate it for depreciation on the vehicle while it is waiting for distributions under the plan. Chrysler relies heavily on *In re Johnson*, 63 B.R. 550 (Bankr.D.Co. 1986). In that case, the debtor's plan proposed a delay of three and a half years before the bank was to begin receiving payments on its claim that was secured by a 1982 Dodge pickup. Unlike *Johnson*, the eight months of depreciation in this case will not leave Chrysler with collateral that has little or no value. If that were the case, then a different result might follow.

Chrysler argues that the concept of adequate protection under 11 U.S.C. § 363(e) is inherent in 11 U.S.C. § 1325(a)(2)(B). Assuming that to be true, without so deciding, Chrysler still overlooks the reasoning contained in the *Timbers* decision. 11 U.S.C. § 361 sets forth how adequate protection may be provided under § 363. The Supreme Court in *Timbers* stated that it reads the phrase "value of such entity's interest" in § 361(1) to mean the value of the collateral. *Timbers*, 484 U.S. at 372, 108 S.Ct. at 631. Therefore, the payments for depreciation that Chrysler seeks would give it more than the value of its collateral. Furthermore, it should be pointed out that Chrysler is adequately protected under the terms of the proposed plan, because its allowed secured claim will be paid in full, with interest. The timing of the valuation also serves to protect Chrysler as it will get an amount equal to the value set as of the date of the filing of the Chapter 13 plan.

The secured creditor certainly has a significant interest in being adequately protected. However, that interest is counterbalanced by the rehabilitative nature of the Bankruptcy Code. If the debtors in this case are forced to pay over $200.00 per month to Chrysler to compensate it for depreciation of the vehicle, then it is entirely likely that a Chapter 13 will not be possible. Depreciation of personal property and the effects of bankruptcy filings are business risks that creditors such as Chrysler are well aware. As both parties have pointed out, it is always possible in a case such as this that the debtor will pay off the mortgage arrears and then file Chapter 7, leaving the creditor with significantly depreciated collateral. However, as in life, all risks can not be eliminated under the Bankruptcy Code, and we find that the debtors should not be deprived the benefits of Chapter 13 reorganization by being required to make adequate protection payments in the circumstances presented to the Court in the case *sub judice*.

## CONCLUSION

We therefore deny confirmation of the plan. An amended plan should be submitted valuing the vehicle at the retail amount reflected in the NADA book as of the date of the filing of the plan, subject to any adjustments under the NADA guidelines for factors such as high mileage or special features on the vehicle. Any proceeds from the Extended Service Warranty that are refunded to Chrysler may be applied to the balance of the secured portion of the loan as per the terms of the retail installment contract. The amended plan does not have to provide for adequate protection payments pending the beginning of distributions to Chrysler.

It is so **ORDERED**.

---

6. In both its letter brief and oral argument, debtor's counsel contended that a security interest could not be granted in a credit life insurance contract. We need not reach that issue as the retail installment contract indicates that the debtor's did not obtain credit life insurance as part of this financing.