**In re Chester Vincent CHRAPLIWY, Jr., Velinda Dale Chrapliwy, Debtors.**

**Bankruptcy No. B–95–13416C–13G.**

United States Bankruptcy Court, M.D. North Carolina.

Oct. 2, 1996.

John Boddie, Greensboro, NC, for Debtors.

Dirk W. Siegmund, Greensboro, NC, for Avco.

Anita Jo Kinlaw Troxler, Standing Trustee, Greensboro, NC.

## ORDER

WILLIAM L. STOCKS, Chief Judge.

This case came before the court on April 9, 1996, for hearing upon the objection to valuation filed by Avco Financial Services ("Avco") in which Avco objected to the valuation of a sofa and recliner in Debtors' Chapter 13 plan. Debtors valued the sofa and recliner at $690.00 and propose to treat the rest of Avco's claim as unsecured. Avco contends that the sofa and recliner should be valued at $1,023.50. Having considered the evidence offered by the parties, the record in this case and the arguments of counsel for the parties, the court makes the findings of fact and conclusions that follow.

### FINDINGS OF FACT

1. Debtors filed this Chapter 13 case on December 4, 1995.

2. On December 20, 1995, Avco filed a secured claim in the amount of $1,035.55 in which Avco claimed a purchase money security interest in a sofa and recliner.

3. On February 14, 1996, Debtors filed a proposed plan in this case. In the plan Debtors proposed to retain the sofa and recliner and to treat the Avco claim as partially secured and partially unsecured, with the secured portion of the claim being in the amount of $690.00. Debtors proposed to pay this portion of the claim at the rate of $30.00 per month with interest at the rate of 11% per annum and proposed to a return of 25% for the unsecured portion of the claim.

4. Avco filed a timely objection to the valuation of $690.00 contained in Debtors' plan for the sofa and recliner.

5. The sofa and recliner were purchased at Colfax Furniture in Greensboro, North Carolina on November 16, 1994, and were new when purchased. The purchase price for the furniture was $398.00 for the sofa and $468.00 for the recliner. In addition, Debtors purchased fabric protection treatment for the furniture at a price of $59.99 for the sofa and $39.99 for the recliner. The sales tax was $57.96 for a grand total of $1,023.94, all of which was financed by Avco.

6. The furniture was delivered to Debtors' residence on or about the date of purchase where it has remained since the date of delivery.

7. The persons who reside at the residence and who have utilized the furniture on more or less a daily basis for approximately fifteen months since it was purchased consist of the Debtors and their two children.

8. Shortly after the sofa was delivered the zipper for the cover for one of the cushions broke. Colfax Furniture repaired the zipper after some delay but did so improperly and the zipper broke again and had to be repaired a second time. As a result the other end of the sofa was used more extensively and became more worn and sustained a broken spring. Additionally, the fabric on both the sofa and the recliner has become soiled notwithstanding the fabric protection treatment which was applied at the time of purchase. Because the recliner is uncomfortable, it has been used less than the sofa and, consequently, is less worn and soiled than the sofa.

## CONCLUSIONS OF LAW AND ANALYSIS

1. Where the Chapter 13 debtor wishes to retain property subject to a security interest, § 1325(a)(5)(B) requires that the Chapter 13 plan provide for the secured creditor to retain its lien and receive property or payments which have a present value at least equal to the allowed amount of the secured claim.

2. The ascertainment of the allowed amount of a secured claim is controlled by § 506(a) which, in pertinent part, provides:

An allowed claim of a creditor secured by a lien on property in the which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less that the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a).

3. Under § 506(a) an undersecured creditor's claim is bifurcated into two parts: a claim that is secured to the extent of value of the creditor's interest in the collateral and a claim that is unsecured for the balance of the allowed claim. The implementation of this bifurcation, in turn, depends upon the valuation of the secured creditor's security interest in the collateral. Once such a valuation has taken place, it is that value which must be matched in the plan of the Chapter 13 debtor who wishes to retain and use the secured creditor's collateral. This much of § 506(a) and its relationship with § 1325(a)(5)(B) is easily understood and accepted with unanimity.

4. Unfortunately there is not unanimity regarding the rest of § 506(a) and the manner in which it should be interpreted in order to place a value on the secured creditor's interest in the collateral. There are numerous cases dealing with the issue of the proper method of determining the value of a secured creditor's interest in property of the estate under the language of § 506(a) for the purposes of § 1325(a)(5)(B). These cases generally are divided along two lines.

5. One line of cases interpreting § 506(a) focuses primarily upon the language of the first sentence which provides that the creditor's claim is secured to the extent of the value of such creditor's interest in the collateral. Pursuant to this language these cases conclude that the property interest being valued is the creditor's lien interest in the collateral and not the debtor's ownership interest. These cases reason that a lien is a right to take possession of the collateral and sell it in satisfaction of the secured obligation. Therefore, the value of the lien is equal to the amount the creditor would receive upon sale of the collateral. This approach generally leads to two conclusions: first, the appropriate value of the lien interest should be based on the liquidation or wholesale value of the collateral rather than its retail value; and second, costs of sale should be deducted from the value of the collateral to arrive at the value of the lien interest, since such costs would have to be incurred by the creditor in disposing of the collateral. *See, e.g., In re Rash,* 90 F.3d 1036 (5th Cir.1996); *In re Mitchell,* 954 F.2d 557 (9th Cir.), *cert. denied,* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992); *In re Marshall,* 181 B.R. 599 (Bankr.N.D.Ala. 1995); *In re Malody,* 102 B.R. 745 (9th Cir. BAP 1989); *In re Smith,* 92 B.R. 287 (Bankr. S.D.Ohio 1988).

6. The second line of cases focuses more on the language of the second sentence of § 506(a) which provides that the creditor's interest must be valued in light of the purpose of the valuation and the proposed disposition or use of the collateral. According to these case, § 506(a), read as a whole, means that when a reorganizing debtor retains and uses collateral, the court must value the collateral according to its worth to the debtor (the actual user) rather than the creditor (a purely hypothetical seller). Under these cases, the first sentence of § 506(a) means that the value of a secured claim is simply the value of the collateral. These cases then focus upon the second sentence of § 506(a) which requires that "[s]uch value shall be

determined in light of the purpose of the valuation and of the proposed disposition or use of such property." Where the "disposition or use" is continued use of the property by the debtor, these cases reason that the court should determine the value of the collateral *to the debtor*. Two primary reasons are given for determining the value of the collateral in the hands of the debtor and not on the auction block: first, to do otherwise would be to completely erase the second sentence of § 506(a); and second, it is contradictory to allow the debtor to keep the collateral but value the secured portion based upon a hypothetical sale. These cases conclude that the value of the collateral to the debtor who has elected to retain and use the collateral is the replacement cost of the collateral, i.e., what it would cost the debtor to buy its equivalent. A great number of these cases reason that the retail value should be used as the replacement cost based upon the assumption that retail price is what the debtor would have to pay in order to replace the collateral. Thus, these courts conclude that the value of the lien should be based on the retail value of the collateral since such is the replacement value to the debtor and that costs and expenses associated with a sale of the collateral should not be deducted since no sale is contemplated. *See, e.g., In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir.1995); *In re Trimble*, 50 F.3d 530 (8th Cir.1995); *In re Arpaia*, 143 B.R. 587 (Bankr.D.Conn.1992).

7. Avco argues that Fourth Circuit authority requires that valuation of collateral retained by a Chapter 13 debtor must be based upon replacement value *and* that the correct measure of the replacement value of such collateral is the "retail value" of the collateral. Avco relies primarily upon the decisions in *In re Balbus*, 933 F.2d 246 (4th Cir.1991), and *In re Coker*, 973 F.2d 258 (4th Cir.1992), in support of this argument. The court agrees that these two decisions probably should be read as requiring that for purposes of § 1325(b)(2)(B) valuations should be made from the standpoint of the debtor and that such valuations should be based upon the replacement value of the collateral. However, the court rejects the argument that the *Balbus* and *Coker* decisions require that "retail value" be used in making valuations in

Chapter 13 cases for purposes of § 1325(b)(2)(B).

■ 8. In the *Balbus* case a creditor sought dismissal of a Chapter 13 case, contending that hypothetical costs of sale should be deducted when calculating the value of debtor's real property for purposes of determining how much of an undersecured creditor's claim should be treated as unsecured indebtedness pursuant to § 506(a). In the *Coker* case the debtors, who were seeking to avoid a junior deed of trust on real estate, argued that hypothetical costs of sale should be deducted in arriving at the value of the property in question. In both cases the Court of Appeals held that the hypothetical costs of sale should not be deducted. In *Coker* the court concluded that such a result was necessary "[i]f the 'proposed use or disposition' provision [of § 506(a) ] is to have any meaning...." 973 F.2d at 260. A similar explanation was offered for the ruling in *Balbus:* "Balbus intends to continue living in his house, so the proposed disposition of the property also counsels that hypothetical costs should not be deducted." 933 F.2d at 252. While neither case involved the specific issue of whether § 506(a) compels a replacement cost valuation when the debtor in a Chapter 13 case proposes to retain the collateral, in both decisions the court treated the fact that a Chapter 13 debtor intended to retain the property as a circumstance which precluded the creditor's interest from being valued at the net amount which the creditor would receive from a hypothetical foreclosure sale. These cases offer strong support for the proposition that if the Chapter 13 debtor proposes to retain the collateral, the secured creditor's interest must be valued by some measure other than looking at the net amount the creditor would receive from a hypothetical foreclosure sale. In both decisions the Court of Appeals interpreted § 506(a) "in such a way that emphasis is placed on the second sentence, i.e., the proposed disposition or use of the property in question." *In re Dews*, 191 B.R. 86, 89 (Bankr.E.D.Va.1995). Together the two decisions convince the court that in this case the court should follow an approach to evaluation which is made from the perspective of the proposed use of the collateral by the

Debtors and is based upon the replacement value of the collateral. Even so, this court does not believe that these Fourth Circuit cases should be read as requiring that collateral must be valued at "retail value" when the debtors in a Chapter 13 case propose to retain the collateral of a secured creditor. In the first instance, neither opinion says anything about how replacement value should be determined and neither mentions the use of "retail value" in determining the value of collateral for purposes of cramdown in Chapter 13 cases. Further, to adopt a mechanical rule in which collateral must be valued at "retail" when retained by the debtors would be inconsistent with the observation by the Court of Appeals in *Balbus* that valuation should be done on a case-by-case basis based upon the particular circumstances of each case. *In re Balbus*, 933 F.2d at 249.

9. The use of the terms "retail value" and "wholesale value" has been the most prevalent in cases involving types of personal property for which published price guidelines are available. Most of these cases involve motor vehicles. Some involve mobile homes. One of the most common of such publications is the *N.A.D.A. Official Used Car Guide* which is published by N.A.D.A. Official Used Car Guide Company. The *N.A.D.A. Official Used Car Guide* ("*NADA*") provides three different values for the motor vehicles listed in that publication: loan value, trade-in or wholesale value and retail value. The values in *NADA* "assume a vehicle is clean." National Automobile Dealers Association, Publisher's Note to *N.A.D.A. Official Used Car Guide*, (Southeastern Ed. Oct. 1996). *NADA* also states that appropriate deductions should be made for reconditioning costs incurred to put the vehicle in salable condition. No additional information is provided in *NADA* as to the exact meaning of "retail" or "wholesale" as used in that publication. It appears that in many of the cases these terms have been used loosely with "retail value" used to describe the replacement cost of collateral and "wholesale value" being used to describe the foreclosure or liquidation value of vehicles. Because neither the cases nor the publications define exactly what is meant by retail "value" and "wholesale value" a certain amount of confusion and uncertainty is generated as a result of the use of those terms.

10. Avco has cited a number of the decisions which have required the use of *NADA* retail value in valuing personal automobiles retained by Chapter 13 debtors. The court does not agree with these decisions and declines to follow them. Obviously every automobile retained by every debtor in every Chapter 13 case is not in the same condition as the vehicles located on a dealer's lot which are being offered at the "retail price" listed by *NADA* and other such publications. Hence to replace the debtor's automobile with an equivalent vehicle will not always require that retail value be used automatically. We need to remember that the purpose of the valuation in these cases is to determine the appropriate value for the particular automobile, mobile home or other collateral involved in the case before the court. If we are to determine replacement value for a motor vehicle, mobile home or other collateral, then the question is what it would cost to replace that particular vehicle, mobile home or other collateral based upon its condition— its strong points as well as its weak points such as dents, lack of maintenance, etc. Experience and common sense strongly suggest that in most Chapter 13 cases the condition and value of an automobile which has been owned, used and maintained by a financially strapped debtor is not the equivalent to the same make and model automobile which is sitting on the lot of the automobile dealer and which has been reconditioned so that it can be offered for the "retail price" listed by *NADA*. To require that the Chapter 13 debtor pay *NADA* retail price for the automobile he or she proposes to retain is unrealistic and unfair in the view of this court. Moreover, there is no single price or value— be it retail, wholesale or the average of retail and wholesale—which should be the sole basis for valuing automobiles or other collateral. Price lists or guidelines such as *NADA* should serve as a starting point for the valuation of the collateral before the court. Either party then should be permitted to offer evidence regarding the condition and worth of the particular collateral in question and whether it should be valued below or above

the published value which is used as the starting point. The *NADA* value thus is some evidence of the value of the automobile but is not conclusive. *See, e.g., In re Madison*, 186 B.R. 182, 184 (Bankr.E.D.Pa.1995). In summary, Avco's position fails for two separate and distinct reasons. First, a price guideline such as *NADA* does not constitute the sole basis for valuing collateral. Secondly, to the extent that price listings or guidelines are available, retail price is not necessarily the appropriate price to use in valuing collateral for purposes of cramdown in Chapter 13 cases.[1]

11. In the present case there was no evidence of any published price guideline which provides wholesale or retail prices for used household furniture. Instead, Avco relied upon the testimony of the operations manager of Colfax Furniture Company, the retail outlet at which the debtors purchased the furniture in question. The witness testified that Colfax sold used as well as new furniture at its store in Greensboro. The witness further testified that if Colfax had possession of Debtors' furniture it would offer the furniture for sale at 90% of its price which the Debtors paid for the furniture when they purchased it, *i.e.*, 90% of $1,023.94. According to the witness this figure represents the current retail value of Debtors' furniture. This is the figure at which Avco apparently contends that the Debtors' furniture should be valued. However, the Avco witness admitted that before used furniture like the Debtors' furniture would bring a retail price, the furniture would have to be professionally cleaned. He also admitted that before offering the furniture at current retail, Colfax would have to repair the broken spring described by the Debtors. The witness was unable to say how much it would cost to clean the furniture and to repair it.

12. Even accepting this testimony at face value, it is clear that the Debtors' furniture is not the equivalent of the used furniture which Colfax apparently offers for sale at its store. The Debtors' furniture has not been professionally cleaned and it has not been repaired and reconditioned. At the very least, the retail figure used by Avco's witness would have to be reduced by the cost of cleaning the furniture and repairing the broken spring in the sofa in order to arrive at a value for the Debtors' furniture since it has not been cleaned and has not been repaired. Furthermore, the witness testified that the used furniture which Colfax offered at 90% of original retail price is furniture which has been subjected only to ordinary wear and tear. The evidence offered by the Debtors established that their furniture has been subjected to considerably more than ordinary wear and tear. The furniture has been used on a daily basis for some fifteen months not only by the Debtors, but also by their two daughters, who are sixteen and six years of age. The zipper on one of the sofa cushions has broken twice. This has resulted in other end of the sofa being used more and becoming more worn than the end which could not be used because of the broken zipper. Moreover, according to the male Debtor, the fabric protector which was applied to the furniture did not work and the furniture has become soiled as well as worn. In short, the court is satisfied from the greater weight of the evidence that the sofa and recliner owned by the Debtors in this case is far different and less valuable than the type of furniture which the Avco witness testified would have a retail value of $921.55. Our goal here is to value the Debtors' furniture, not some hypothetical furniture which Colfax says it could sell at 90% of its original price. The court therefore is unwilling to use the "retail price" sought by Avco in this case.

13. There are sources from which one may acquire used household furniture other than from a furniture retailer who cleans and reconditions the furniture before offering it

---

1. For example, in cases involving personal automobiles, the better approach and the one that most frequently will yield a value which is most realistic for the type of personal vehicle most frequently involved in Chapter 13 cases is to utilize the average of the *NADA* retail and wholesale values for the vehicle as the beginning point

for the valuation. *See In re Mitchell*, 191 B.R. 957 (Bankr.M.D.Ga.1995); *In re Madison*, 186 B.R. 182 (Bankr.E.D.Pa.1995); *In re Hoskins*, 183 B.R. 166 (Bankr.S.D.Ind.1995); *In re Myers*, 178 B.R. 518 (Bankr.W.D.Okla.1995); *In re Carlan*, 157 B.R. 324 (Bankr.S.D.Tex.1993).

for sale. It may be purchased at a yard sale conducted by one who is not in the furniture business. It may be purchased at flea markets where the used furniture is sold "as is" without being professionally cleaned or repaired. It may be purchased in response to an advertisement placed in the newspaper by someone who has purchased new furniture or moved into a smaller home. There is a market for used furniture and therefore a particular item of used furniture has market value—the price which it would command in the open market. Stated another way, the market value of an item is the price which a willing buyer would pay and a willing seller would accept, both being fully informed, and the property being exposed for a reasonable period of time. *See United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528, 533 (1973) ("fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts"); *In re Arnette*, 156 B.R. 366, 368 (Bankr.D.Conn. 1993) (fair market value is the price of the property "in a free and open market"); *In re Hubbard*, 135 B.R. 430, 433 (Bankr.S.D.Fla. 1991).

14. In the present case the court concludes that for purposes of applying § 1325(a)(5)(B) in this Chapter 13 case, the furniture in question should be valued at its market value. If the Debtors had to replace their furniture with equivalent furniture they could do so by paying the market value for equivalent used furniture. In short, the replacement cost of the collateral is its market value or market price. To replace the furniture in question with equivalent furniture the Debtors would not go to Colfax Furniture and purchase professionally cleaned and reconditioned furniture. If they did so, they would be upgrading their den or living room rather than refurnishing it with furniture of the same quality and condition as they now own and wish to retain. Rather, to purchase comparable or equivalent furniture the Debtors most likely would resort to a different segment of the market place such as a yard sale, flea market or a furniture store or consignment shop where *comparable* furni-

ture is available. The male Debtor offered testimony regarding the price at which comparable furniture may be acquired at yard sales which was considerably below the figure urged by Avco. The court is satisfied from the evidence that the market value of the furniture in this case does not exceed the $690.00 figure utilized in Debtors' plan. Therefore, Avco's objection to the valuation of the furniture should be overruled.

IT IS SO ORDERED.