**In re Peter KIM and Esther Kim, Debtors.**

**ARDMOR VENDING CO. dba Great Northern, Ardmor Co. Profit Sharing Plan, Appellants,**

v.

**Peter and Esther KIM, Appellees.**

**BAP No. CC–96–1017–MeRuV.**
**Bankruptcy No. LA95–26561–SB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued July 24, 1996.

Submitted Aug. 5, 1996.[1]

Decided Jan. 30, 1997.

1. On July 24, 1996, the Panel issued an order deferring the submission date and directing the appellant to supplement the record.

Myles M. Mattenson, Los Angeles, CA, for Ardmor Vending Co.

A. Edward Briseno, Law Offices of David B. Bloom, Los Angeles, CA, for Peter & Esther Kim.

Before: MEYERS, RUSSELL [2] and VOLINN, Bankruptcy Judges.

**2.** Hon. David E. Russell, Chief Bankruptcy Judge for the Eastern District of California, sitting by

## OPINION

MEYERS, Bankruptcy Judge:

### I

The debtors filed a Chapter 13 plan proposing to treat one creditor as only partially secured and another as wholly unsecured. The creditors objected to the plan contending that the debtors had undervalued the collateral securing their claims. The debtors responded by filing objections to the creditors' claims. The bankruptcy court sustained the claims objections and confirmed the plan.

We AFFIRM.

### II

### FACTS

Peter and Esther Kim ("Kims") operated a dry cleaning business. Ardmor Vending Co., dba Great Northern ("Great Northern"), and Ardmor Co. Profit Sharing Plan ("Ardmor") (collectively referred to herein as the "Appellants") were creditors secured by the business's equipment. Great Northern also took an assignment of the business lease as collateral. The Kims have not contested the validity of the security interests asserted by the Appellants.

On June 30, 1995, the Kims filed for relief under Chapter 13 of the Bankruptcy Code. As of the petition date Great Northern was owed $99,595 and Ardmor was owed $10,000. In their bankruptcy schedules the Kims listed the fair market value of the equipment as $34,000.

The Kims filed several Chapter 13 plans with the first being filed on July 14, 1995. In the original plan Great Northern was treated as secured in the amount of $34,000 and otherwise unsecured, while Ardmor was treated as completely unsecured. On August 2, 1995, the Appellants objected to this plan on the basis that their claims were improperly treated as unsecured claims. A hearing on confirmation was set for September 11, 1995.

designation.

On August 18, 1995, the Appellants filed a supplemental objection in the form of the declaration of Irving D. Weiner ("Weiner"), the chief executive officer of Great Northern. Weiner declared that in his view the collateral, both the equipment and lease together, was worth approximately $100,000.

On August 18, 1995, the Appellants also filed proofs of claim: Great Northern in the amount of $98,758.97, plus interest from the petition date, and Ardmor in the amount of $10,437.49.

On August 30, 1995, the Kims filed a reply to the plan objection. They objected to the introduction of Weiner's valuation on the basis that he was not a qualified "valuation expert i.e. an appraiser," and he had not explained his methodology in reaching his valuation. The Kims also contended that the lease had no value because the rent exceeded the market value. In support of this argument, the Kims filed the declaration of Todd Basmajian ("Basmajian"), a Member of the Appraisal Institute ("MAI") and certified real estate appraiser. He concluded that the terms of the lease provided for rent in the amount of $3.97 per square foot, while the market rate, in his opinion, was $1.50.

In the Kims' final modified Chapter 13 plan, which is the subject of this appeal, the Appellants' claims essentially were treated as they had been in the first plan. The Kims then filed objections to the Appellants' claims, which basically repeated the arguments they had raised in response to the Appellants' objection to the plan.

On November 1, 1995, the Appellants filed additional pleadings in response to the claims objections. The Appellants contended that the best valuation method would be to take the business as a whole rather than attempt to separately value the lease and equipment and that the Kims had failed to provide any evidence as to the value of the business. They also contended that Basmajian failed to take into account that the Kims had been able to modify their lease and reduce the rent from nearly $7,500 per month to $4,760 per month, as reflected in their Schedule J. Additionally, the Appellants filed the declara-

tion of Robin D. Rix ("Rix"), a real estate agent who had previously listed the Kims' business for sale. He maintained that were he to sell the business he would list it for $175,000 and expect to get $165,000.

A hearing on the claims objections was conducted on November 13, 1995.[3] The Appellants argued that they were secured by the equipment and the lease and that when the two were taken together as a package there was value in excess of their claims. However, the court viewed the Appellants' argument as an improper attempt to be treated as being secured by the value of the entire business. The trial court stated that the Appellants' security interest in the lease and the equipment was "something substantially short of a security interest in the business, though." The court continued the hearing to December 4, 1995, to allow the parties an opportunity to file further pleadings.

The Kims filed supplemental claims objections on November 22, 1995, along with another declaration from Basmajian. The Kims argued that the only remaining issue was the value of the lease. The Kims then contended that the Rix declaration was flawed because he had premised his opinion on the value of the entire business. Basmajian reiterated that if the contract rent exceeded the market rent, the lease would have no value.

The Appellants responded on November 30, 1995 and filed an additional declaration from Weiner. He again gave a very general overview of his business background and then declared that a sale of the equipment "off-location" would not bring in more than $45,200. He did not explain how he arrived at that figure. Additionally, he declared that Great Northern had never conducted an "off-location" sale of equipment. The declaration included a review of allegedly comparable sales Weiner's company had conducted over the prior three years.

The final hearing was conducted on December 4, 1995. The court ruled that Weiner's declaration lacked a "sufficient founda-

---

3. A brief hearing also had been conducted on September 11, 1995, but the matter was continued to allow the court an opportunity to review the pertinent pleadings.

tion" for the valuation of the equipment and that Weiner had failed to demonstrate that he was competent to testify as to the value of the equipment. The court also ruled that the Appellants' evidence of Great Northern's other sales of equipment and leases was not admissible because it did not include the exact location of those businesses, the dates of the sales and the names of the parties involved. The Appellants sought a continuance so that they could supply the court with that information. The court rejected the request.

The court concluded that the lease had no net value because the payments under the lease were at least equal to the market rate. As for the equipment, the court found that the only admissible evidence was the Kims' statement that the equipment was worth $34,000, and that the other evidence did not "relate to what the value of the equipment is apart from the value of the business, in which the secured creditor—in which the creditor does not have a security interest...." The court sustained the claims objections. The court then confirmed the Kims' Chapter 13 plan.

## III

### STANDARD OF REVIEW

■ The court's findings of fact concerning value are reviewed under a clearly erroneous standard. *In re Tuma*, 916 F.2d 488, 490 (9th Cir.1990). The Panel must be left with the definite and firm conviction that a mistake has been committed before a factual finding can be determined to be clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ We review under an abuse of discretion standard the trial court's evidentiary rulings. *In re Karelin*, 109 B.R. 943, 947 (9th Cir. BAP 1990). Additionally, we apply that same standard to our review of the court's denial of a continuance to allow the Appellants to supplement the record. *U.S. v. Mejia*, 69 F.3d 309, 314 (9th Cir.1995).

**4.** The Court of Appeals' *en banc* opinion was decided on September 17, 1996, during the pen-

## IV

### DISCUSSION

A. *Examination of the Court's Methodology*

The Appellants contend that the Panel should apply a *de novo* standard in its review of the court's valuation on the grounds that the court used an improper methodology. Specifically, they maintain that the court erred as a matter of law by applying a liquidation analysis in contravention of *In re Taffi*, 68 F.3d 306 (9th Cir.1995), *affirmed as modified en banc*, 96 F.3d 1190 (9th Cir. 1996).[4]

■ We recognize that *Taffi* is the controlling authority in this circuit for valuations under Bankruptcy Code Section 506. *Taffi* holds that a bankruptcy court must determine the fair market value of the collateral and not its liquidation value if the collateral is to be retained by the debtors under their plan. However, the Appellants have failed to show that the bankruptcy court acted contrary to this proposition. Instead, a review of the record demonstrates that the court's valuation was dependent on the evidence presented and not on the application of an allegedly incorrect standard. In fact, the parties provided the court with very limited evidence as to the value of the collateral, with the Appellants putting forth only the declarations of Weiner and Rix to support their assertions as to the value of the collateral. The court made certain evidentiary rulings, discussed below, and then simply resolved the matter based on the remaining relevant evidence.

B. *Valuation of the Lease and Equipment*

■ The Appellants argue that the court improperly valued the equipment and lease separately; rather, they contend that the value of the entire business essentially consisted of the equipment and lease. However, the court properly recognized that the securi-

dency of this appeal.

ty interest was limited to the equipment and the lease and did not include all value of the business. Indeed, there can be no dispute concerning the actual scope of the Appellants' security interest.

### 1. Valuation of the Lease as a Starting Point

■ The court began its analysis with an examination of the value of the lease. This was as reasonable a place to start as any. The only direct evidence of the value of the lease in question was brought in by the Debtors through the declaration of Basmajian. The Appellants did not make any objections regarding his qualifications.

Basmajian asserted that the rent in the lease was far above market rate and, therefore, had no value. He fully explained the method utilized and provided information on comparable rates. Although the Appellants pointed out that Basmajian did not take into account any reduction in rent, they failed to demonstrate that his declaration was flawed as it related to the current market rental rate. At that point, the numbers spoke for themselves. The current market rate was $1.50 per square foot and, even under the modified rate, the Kims were paying approximately $2.53 per square foot.[5] Clearly, the lease provided for rent far above the market rate. We do not see any reversible error in the court finding that the lease had no fair market value.

The Appellants presented a declaration from Weiner concerning past sales conducted by the Appellants of leasehold interests and equipment. The court ruled that evidence of the previous sales conducted by the Appellants was not admissible because they had not disclosed the buyer, seller and exact location. We agree that such information would be necessary before the court could give much weight to the evidence. We note also that the declaration did not contain any information which would indicate whether the leases involved in those sales were above,

below or at fair market value. Therefore, it added nothing to determining the value of the Debtors' lease.

### 2. The Equipment was the Remaining Collateral

The court then directed the parties to focus their attention on the value of the equipment. The Appellants presented the declarations of Rix and Weiner, while the Debtors relied on their uncontested valuation set forth in their schedules.

#### i. Declaration of Robin Rix

■ The Rix declaration is barely two pages long and lacks any detail. As the trial court pointed out, Rix's declaration only gave a value for the entire business, although that exceeded the scope of the Appellants' security interest. This was also a point raised by the Debtors in an objection to the Rix declaration. Rix did not explain how the equipment and leasehold interest were valued within that overall valuation. We agree with the court that this was a sufficient basis for not giving the Rix declaration any weight.

#### ii. Declarations of Weiner

■ All that remained to support the Appellants' position were the declarations from Weiner. These also proved to be of limited use. On August 18, 1995, Weiner declared that the collateral, equipment and lease together, was worth $100,000.[6] He did not present a breakdown of the value of equipment. The Kims objected on the basis that Weiner was not a qualified expert and had not explained his methodology for reaching his determination.

Weiner's subsequent declaration still failed to explain how he had determined the value of the Kims' equipment. The trial court gave the Appellants an opportunity to explain if Weiner's valuation was based on comparable sales. In response the Appellants provided data concerning sales of equipment and leases they had conducted, as well as estimates by Weiner as to what he believed the equip-

---

**5.** This is based on rent of $4,760 for 1880 square feet.

**6.** We note that in his November 30, 1995 declaration, Weiner asserted that the collateral was

worth between $125,000 and $165,000. However, he failed to explain why the value had increased from his earlier assertion that the collateral was worth $100,000.

ment would have sold for had it been sold separately.

The trial court examined the declaration and questioned counsel as to how Weiner arrived at his estimates for the equipment values. Counsel acknowledged that the amounts were not based on actual sales. Instead, he explained that the estimates were "based upon his [Weiner's] understanding of what they would draw if there were to be public sales of the equipment. But he would never sell it that way." Indeed, in his declaration, Weiner admitted that his estimates were not based on personal knowledge, in so much as the Appellants had never in the history of their business conducted separate sales of equipment. Consequently, the trial court ruled that Weiner was not competent to speculate as to the value of the Debtors' equipment.

Lay opinion is only admissible if it is rationally based on the perception of the witness. Federal Rule of Evidence 701; *Joy Mfg. Co. v. Sola Basic Industries, Inc.*, 697 F.2d 104, 111 (9th Cir.1982). This requirement "reflects the general limitation embodied in Federal Rule of Evidence 602 that in order to testify on a subject a witness must have 'personal knowledge of the matter.'" *Id. (quoting Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)). Weiner's valuation of the equipment was admittedly speculative, and was not based on personal knowledge. We do not see any abuse of discretion in the court's decision to exclude Weiner's declarations on the value of the equipment.

■■■■ The Appellants have asserted that Weiner was testifying as an expert under Federal Rule of Evidence 702. The qualification of an expert is a question which lies within the sound discretion of a trial judge whose ruling will not be overturned in the absence of clear abuse, a standard which will be rarely met. 3 *Weinstein's Evidence* ¶ 702[04], p. 702–53. *See United States v. Booth*, 669 F.2d 1231, 1240 (9th Cir.1981) (abuse of discretion standard applied to review of court's refusal to admit expert testimony on grounds of relevance).

The record does not indicate that the Appellants ever asked the court to treat Weiner

as an expert witness. Rather, his declarations stated each time that his testimony was purportedly based on personal knowledge. The declarations did not assert that Weiner was presenting opinion testimony as a qualified expert witness. Allowing Weiner to testify as an expert would have required a factual finding regarding his qualifications. The Appellants have failed to demonstrate that they presented this argument to the trial court, and therefore, we consider it waived. *In re Lund*, 202 B.R. 127, 131 (9th Cir. BAP 1996).

Additionally, the deficiency with Weiner's declaration could not be overcome by merely asserting that he was an expert. Even an expert would have to provide an adequate explanation as to how he had reached his conclusions if his testimony were to have any value. Consequently, to the extent that the court chose to disregard Weiner's declaration because he did not qualify as an expert, we cannot say that this was an abuse of discretion.

iii. Valuation of Equipment by the Debtors

■■■■ All that remained before the court for consideration was the Kims' own assertion that the value of the property was $34,000. As owners of the business, the Debtors were competent to give their opinion as to the value of their property. *Robinson v. Watts Detective Agency*, 685 F.2d 729, 739 (1st Cir.1982).

The dissent states that it is "surprising" that the trial court accepted the Debtors' valuations since, in the dissent's opinion, that valuation was no less speculative than Weiner's. Additionally, the dissent states that "[n]ot a single question was asked of the Debtors as to how they came up with that amount. No examination of the Debtors' factual basis and no probing of the Debtors' methodology appears anywhere in the record." In other words, the Appellants did not raise any objections to the introduction of the Debtors' valuation, nor did they seek to question the Debtors regarding this figure. Accordingly, we cannot agree with the dissent's characterization of the trial court's decision because we believe it was incumbent on the

*Appellants* to object to the Debtors' valuation if they believed it was inadmissible.

The Appellants' inaction stands in stark contrast to the Debtors' response to the introduction of the Appellants' evidence. The Debtors *did* object to the declarations of Rix and Weiner. In fact, they specifically objected to Weiner's declaration because he failed to explain the methodology utilized in reaching the valuations he did. Weiner's declaration became inadmissible because the Debtors raised an objection and the trial court upheld the objection. On the other hand, no objection was raised as to the Debtors' valuation. If the Appellants believed that the Debtors' valuation was lacking and that the court should not have relied on it, they should have raised this before the court. Instead, they failed to present any reason for the court to disregard what was otherwise admissible evidence.

Only now do the Appellants assert that this valuation was a liquidation value. However, as the Kims point out, the bankruptcy schedules required them to state their opinion of the current market value of the equipment, not a liquidation value. We see no error in the court choosing to rely on the valuation provided by the Kims.

### 3. Value of the Entire Business

We have discussed the limited scope of the Appellants' security interests. The bankruptcy court's factual findings set forth the fair market value of the pertinent collateral. Still, the dissent argues that the Appellants' security interests should be viewed as equal in value to the value of the entire business. We now address this point in more detail.

We see no error in the trial court's finding that the lease exceeds market rate. If an essential component of the collateral is a lease which exceeds market rate, this component, realistically, cannot excite interest on the part of a buyer who does not have to buy, and therefore, such a lease has little, if any, intrinsic value. It might be that the secured creditor or a purchaser could independently negotiate a lease which would make continued occupation and operation worth while, but that is problematic if not speculative. There is nothing in the record which would warrant, let alone require, such a finding.

Implicit in the Appellants' argument is the notion that somewhere, somehow, a purchaser would want to accept an uneconomical lease because the dry-cleaning equipment was there. This might have been done before or in a number of cases, but what the persuasions and representations were have not been made known. But we cannot agree that an uneconomical lease can per se become valuable simply because the tenant is permitted to occupy the premises.

■■■■ The dissent presents a very thoughtful discussion of what may or may not be valuable in a dry cleaning business. While the dissent does a masterful job in analyzing the evidence in great detail, we view our role as an appellate court as more narrowly defined. When the bankruptcy court's findings are plausible in light of the entire record, the Panel may not reverse even if it is convinced that it would have weighed the evidence differently had it been sitting as the trier of fact. *Anderson v. Bessemer City, supra,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* Further, the Appellants simply did not present any evidence which supports the dissent's breakdown of the value of a dry cleaning business. While we might not disagree that the dissent's viewpoint could be supported by the proper presentation of evidence, we believe it was incumbent on the Appellants to present such evidence. Despite being given numerous opportunities to supplement the record, the Appellants consistently failed to demonstrate that the bankruptcy court must accept their valuations of the whole business as being the equivalent of the property in which they actually had an interest.

### C. *Court Did Not Abuse Discretion in Denying Continuance*

■■■■ Finally, the Appellants assert that the court should have granted them a continuance so they could have presented the court with the names of the buyers and sellers and the exact locations of the business involved in the prior transactions. Granting

or denying a continuance was within the discretion of the court. *U.S. v. Mejia, supra,* 69 F.3d at 314. The matter had been pending for several months and the Appellants had several opportunities to present evidence to the court. In fact, prior to the last hearing the court invited the parties to file "[w]hatever is appropriate to determine the value of the collateral." Additionally, before we could reverse, the Appellants would need to show that they have suffered prejudice due to the denial of the request. *Id.* at 314–15. The information the Appellants sought to present still would not have demonstrated Weiner's personal knowledge concerning the equipment owned by the Kims. Also, as we explained, the data on previous sales had little value because it did not indicate if the leases involved were above or below market rates and Weiner would not have been qualified to present such evidence. Consequently, the Appellants have failed to demonstrate prejudice. The court did not abuse its discretion when it denied the request for a continuance.

## V

### CONCLUSION

The Appellants have failed to demonstrate that the bankruptcy court abused its discretion in making the evidentiary rulings that it did. Effectively, what was left for the court to consider was the statement of fair market value presented by the Debtors in their schedules. Based on this, the court made its factual finding concerning the value of the collateral. Pursuant to these dictates, we cannot say that the bankruptcy court's finding as to the value of the collateral was clearly erroneous.

AFFIRMED.

DAVID E. RUSSELL, Bankruptcy Judge, Dissenting:

In order to secure its investment, Great Northern [7] took more than the typical lien on the Debtors' dry cleaning equipment. It also obtained an assignment of the lease for the Debtors' business premises. In the event of default, the creditor could evict the Debtors and sell the equipment in combination with the premises lease as an ongoing dry cleaning business. The court below and the majority decision today strip the creditor of the value of its bargain. Because I believe the bankruptcy court made a clearly erroneous mistake of fact as well as a mistake of law, I respectfully dissent.

### ERROR OF FACT

Great Northern sells and finances laundromat and dry cleaning equipment. Few of its customers default, but Great Northern is not naive about its loans or credit sales; as an experienced vendor, Great Northern secures itself to the greatest extent possible against loss. Not only does Great Northern take back a security interest in everything it sells to a customer, it also takes an additional step: it makes the purchaser sign over the lease to the premises and obtains the right to reassign the lease from the landlord. The effect of this combination should not be underestimated. By perfecting its priority in the equipment, the lease, and, by virtue of the lease, the leasehold improvements, Great Northern captures everything of value; it secures itself with all the fixed assets necessary to generate an income stream. In the event of default, rather than having to step in and tear the equipment out, Great Northern can step in and kick the debtors out.

In the case at bar, the court viewed Great Northern's security interest otherwise. The court said "[w]ell, it doesn't look like you'd have a security interest in the business, sir. You have a security interest in equipment and you have a security interest in a lease." Later, the court said: "you [Great Northern] don't seem to have a security interest in income-producing potential either. All you have is the security interest in equipment and—the income-producing potential seems to belong to the Debtor." And when Great Northern explained it planned to market the business as a turn-key operation, the court explicitly ruled Great Northern lacked a "turn-key situation".

7. This dissent focuses on the security interest held by Great Northern as opposed to that of Ardmor Plan since Ardmor Plan's security interest is junior to Great Northern's.

What more could Great Northern possibly need to obtain a turn-key operation? True, it lacked any interest in the accounts receivable, the sundry dry cleaning supplies, and the business name. And true, Great Northern had no right to the chapter 13 Debtors' managerial skills. But Great Northern had plenty to market. Stated plainly, good will in a dry cleaning business belongs to the situs—if the manager walks away, the customers stay. Great Northern, by securing its loan with every one of the fixed assets of the business, assured itself that, in the event of default, it could market the site as a dormant business waiting for an entrepreneur willing to add labor. Neither the court nor the Debtors (nor the majority) points to a single additional piece of collateral Great Northern might need before it could sell the site as such. As discussed below, this holding, that Great Northern lacked a "turn-key situation," led the bankruptcy court to neglect the most relevant evidence offered as to the market value of Great Northern's secured claim.[8]

## ERROR OF LAW

The court below also made a mistake of law. Great Northern contended its collateral should be valued in its proposed use: as part of an income-producing going concern. The court instead endorsed the Debtors' valuation methodology. However, the Debtors' valuation amounted to a liquidation. First, the Debtors separately valued the leasehold, as if marketed as an empty, unimproved site. After finding the lease to be of no value in this hypothesized sale, the Debtors then proceeded to another hypothesized sale: a separate auction of the dry-cleaning equipment, "off location on the street, not income producing." This is the "reasonable disposition" approach and the Ninth Circuit has rejected it.

Section 506(a), the section that governs the classification of a creditor's claim as secured or unsecured, uses very flexible language and a court has wide latitude in how it may approach a valuation task. However, § 506(a) valuations are not completely *ad hoc;* bankruptcy courts see recurring types of collateral in recurring situations and legal standards have developed to create some uniformity in claim valuations. The Ninth Circuit recently discussed appropriate standards in *In re Taffi*, 96 F.3d 1190 (9th Cir.1996) (*en banc*). The court stated:

When a Chapter 11 debtor or a Chapter 13 debtor intends to retain property subject to a lien, the purpose of a valuation under section 506(a) is not to determine the amount the creditor would receive if it hypothetically had to foreclose and sell the

---

**8.** The Debtors and the majority make much of the estimate by the Debtors' expert, Basmajian, on the value of the lease. Basmajian surmised that the lease was worthless, and perhaps might have a negative value. But Basmajian misconceived the nature of the valuation task at hand; he based his estimate on the marketability of the leasehold as an empty, unimproved site. Neither the Debtors nor Great Northern ever proposed a separate sale of the lease. Instead, the Debtors planned to retain the lease. By failing to account for this proposed use, Basmajian rendered his lease valuation legally irrelevant, and the court should have given it no consideration. *In re Taffi*, 96 F.3d 1190 (9th Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3433 (U.S. Oct. 31, 1996) (No. 96–881).

Basmajian's estimate was factually irrelevant as well. Prospective purchasers of a business or income-producing property (as opposed to purchasers of unimproved leaseholds) price an operation by estimating its potential for generating a net income stream. The net income stream is then capitalized using a discount factor sufficient to compensate the purchasers for their investment and risk taking. *In re SM 104 Ltd.*, 160

B.R. 202, 211 (Bankr.S.D.Fla.1993); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 338 (Bankr.S.D.Ohio 1992). Only actual rent has any impact on that analysis: it is a recurring, fixed, monthly expense which must be deducted from expected earnings. The higher the fixed cost, the lower the expected net income stream, and the lower the business price. Only if the rent at the leasehold site was so high as to completely swamp out any potential for a positive net income stream would the business have no value to a prospective purchaser. What "market" rent the leasehold might fetch in some hypothetical or imaginary use, while perhaps significant in theoretical economic models, is of no pertinence to a small-business valuation of the type at issue. The clearest demonstration of the truth of this proposition comes from the Debtors themselves: despite their own expert's declaration, the Debtors appear quite ready and willing to assume the lease. The bankruptcy court erred in giving any weight to an estimate of the separate sales price for an unimproved leasehold. The object to be valued was the leased premises with the installed equipment, i.e., a business opportunity.

collateral.... Instead, when the proposed use of the property is continued retention by the debtor, the purpose of the valuation is to determine how much the creditor will receive for the debtor's continued possession.

*Id.* at 1192.

In a reorganization, the Debtor's "proposed use" is to keep the collateral plugged in as a component of a continuing business. Consequently, "if the debtor retains the property as part of a reorganization, the proper measurement of the estate's interest in the property is the **'going-concern' value of the collateral** to the debtor's reorganization." *In re Taffi,* 68 F.3d 306, 308 (9th Cir.1995) (quoting *Matter of Rash,* 31 F.3d 325, 329 (5th Cir.1994)) (emphasis added).[9] *See also In re Chateaugay Corp.,* 154 B.R. 29, 33 (Bankr.S.D.N.Y.1993) (going concern valuation applied to the claims of bondholders secured by selected "hard assets" used in the debtor's operations); *In re Wendy's Food Systems, Inc.,* 82 B.R. 898, 900 (Bankr. S.D.Ohio 1988) (going concern or "in-place" standard used to value the claim of a creditor secured by equipment used in the debtor's restaurants); *In re Penz,* 102 B.R. 826, 828 (Bankr.E.D.Okla.1989) (creditor's secured claim is entitled to be valued to the extent of its contribution to the entire estate *vis-a-vis* going concern value); *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 75 (1st Cir.1995) (a court must consider the debtor's use of the collateral to generate an income stream in a chapter 11 business reorganization); *National Rural Utilities Co-op. Finance Corp. v. Wabash Valley Power Ass'n., Inc.,* 111 B.R. 752, 768–770 (S.D.Ind.1990) ("willing buyer-willing seller" standard applied in the context of a going concern); *In re Bellanca Aircraft Corp.,* 56 B.R. 339, 386– 387 (Bankr.D.Minn.1985) (going concern valuation incorporates more than a summation of market values attributable to an entity's various assets; only where a business is

wholly inoperative will going concern valuation be abandoned in favor of an item by item valuation) *rev'd in part on other grounds,* 850 F.2d 1275 (8th Cir.1988).

Of particular note, the Ninth Circuit explicitly rejected the alternative "reasonable disposition" approach, stating: "[w]e overrule *In re Mitchell,* 954 F.2d 557 (9th Cir. 1992) to the extent that it held the valuation under section 506(a) should be based on determining 'what the creditor would obtain if the creditor were to make a reasonable disposition of the collateral.' *Id.* at 560." 96 F.3d at 1193. Some courts had viewed this as an acceptable method by which to value secured claims. However, the vice in this method (as demonstrated by the case at bar) was that it created an improper incentive in reorganization cases. By permitting debtors to strip down the liens of secured creditors, piece by piece, to the "commercially reasonable disposition"[10] (i.e. liquidation) price of the separate collateral components, debtors were able to capture for themselves or their unsecured creditors the surplus value of the organization which, before the bankruptcy filing, belonged to the secured creditors. *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d at 76; *Matter of Rash,* 90 F.3d at 1073 (Smith, J., dissenting). In short, it allowed debtors to usurp the equity inherent in a going concern. To permit the Debtors to usurp the equity in this case is particularly egregious, because Great Northern bargained for the lease assignment for the very purpose of protecting the going concern value of its equipment.

Both the parties, and the majority, agree that *Taffi* supplies the appropriate standard for this case. However, the timing of the decision is critical. The court completed its valuation hearings **before** the Ninth Circuit published its *en banc* decision, the one that explicitly overruled the "reasonable disposi-

---

9. The Fifth Circuit, sitting *en banc,* reversed the Fifth Circuit panel decision quoted above. *Matter of Rash,* 90 F.3d 1036 (5th Cir.1996). However, the Ninth Circuit, in its *en banc* rehearing of *Taffi,* sided with the *en banc* dissent in *Matter of Rash. In re Taffi,* 96 F.3d at 1192.

10. *Taffi* rejected the use of a foreclosure sale price when valuing a creditor's claim secured by **real property.** A "commercially reasonable disposition" is the **personal property** analog to a foreclosure sale. *See* Cal.Com.Code § 9504(3); *In re Crosby,* 176 B.R. 189 (9th Cir. BAP 1994), *aff'd,* 85 F.3d 634 (9th Cir.1996).

tion" approach.[11] Unless able to correctly divine the implication of the Ninth Circuit Panel's opinion in *Taffi* (which itself was published in the midst of the three valuation hearings in the court below), the court simply had no reason to suspect that "reasonable disposition" pricing represented an improper valuation standard. Consequently, the appropriate adjudication of this case is to remand it for reconsideration in light of the Ninth Circuit's intervening decision. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1448 (9th Cir.1994).

That the court used the "reasonable disposition" method is obvious from the hearing transcripts. The court explicitly endorsed the method in the following exchange:

> [GREAT NORTHERN]: When he [the Debtors] speaks of $34,000 as the value of the equipment, that's off location on the street, not income producing.
>
> THE COURT: Well, that's the way you have it, sir."

In other words, the court valued the claim at the price Great Northern would receive if it removed its equipment from the leasehold and sold it off-site. That is a hypothetical sale; it is not the Debtors' "proposed use", and it amounts to de facto foreclosure or liquidation pricing. It was error as a matter of law for the court to value the equipment "off location on the street, not income producing" when the Debtors planned on retaining the equipment in their reorganized business.

When Great Northern presented evidence valuing the equipment based on its income-producing potential as a part of the Debtors' business, the court rejected the evidence, stating "[a]ll you have is the security interest in equipment and—the income-producing potential seems to belong to the Debtor." Again, that was error as a matter of law. Great Northern was entitled to have its claim valued to the extent of its contribution to the business *vis-a-vis* going concern value; at

least a portion (if not all) of the income-producing potential did belong to Great Northern.

And, in its ruling, stated on the record, the court held:

> The court finds that the other evidence [Great Northern's] does not relate to **what the value of the equipment is apart from the value of the business** .... (emphasis added).

In other words, the court failed to consider the Debtors' "proposed use" for the collateral; the Debtors planned to assume the lease, retain the equipment, and continue to operate the reorganized dry cleaners. The value of the equipment, as a part of the value of the business, was exactly how Great Northern's collateral should have been valued.

## THE EVIDENCE IN THE COURT BELOW

The impact of the foregoing errors is seen in the bankruptcy court's evidentiary rulings. Great Northern introduced extensive (and competent) evidence valuing the dry cleaning equipment and lease as a turn-key operation. The bankruptcy court rejected this evidence, but not due to any technical failing in its admissibility. Rather, believing Great Northern lacked any security interest in "income-producing potential", and believing the collateral components should be separately valued at their disposition price, the court viewed Great Northern's evidence as irrelevant.

For example, the court gave no weight to the estimate of Robin Rix, Great Northern's expert. Rix has twenty-six years of experience in the dry cleaning industry. He began by servicing machines, later sold dry cleaning supplies, then advanced into management. He has since built, installed, consulted on, owned, and now sells turn-key dry-cleaning businesses for a living. In the past nine years, Rix closed over three hundred and

---

**11.** The trial court held a brief hearing on the valuation question on September 11, 1995, but continued the matter. On October 10, 1995, the Ninth Circuit Panel decided *In re Taffi*, 68 F.3d 306 (9th Cir.1995). The trial court held two additional valuation hearings, one on November 13, and the other on December 4, 1995. However-

er, neither party brought the *Taffi* decision to the court's attention. On September 17, 1996, after this appeal was taken, the Ninth Circuit, sitting *en banc*, decided *In re Taffi*, 96 F.3d 1190 (9th Cir.1996). The *en banc* decision explicitly overruled *In re Mitchell*, 954 F.2d 557 (9th Cir.1992).

fifty sales of dry-cleaning businesses. In the last year alone, he averaged eleven sales per quarter, roughly one a week. The Debtors themselves employed Rix to sell their dry-cleaning business in 1992.

Based upon his familiarity with both the business and its location (from his previous employment with the Debtors), and after reviewing the Debtors' schedule of business income and expenditures, Rix estimated the business would sell for $165,000. The key here is that neither the Debtors nor the court took issue with the quality of Rix's testimony. Instead, the court took the view that, because Great Northern lacked a security interest in the business itself, Rix's estimate, based on the value of the business, warranted no consideration. In other words, the court did not weigh the evidence, it rejected it outright as irrelevant[12], premised on its view of the scope of the creditor's security interest. As discussed above, that factual premise is clearly erroneous, and the error led the court to neglect highly relevant evidence.

Similarly, Weiner's declaration valued the collateral as part of a going concern. As to his competency, it is difficult to conceive of anyone more qualified to estimate the value of dry-cleaning equipment or the value of a dry-cleaning business than Weiner. He has built, equipped, and sold laundromat locations for over forty-two years. He has been in the business of building, equipping, selling, and financing dry-cleaning operations for thirteen years. He is the chief executive officer of a company whose sole function is to sell and finance dry-cleaning equipment.

Before valuing the collateral, Weiner assessed the lease terms for the premises, the leasehold improvements at the site, the location of the facility, the equipment held by the Debtors, and the Debtors' schedule of business income and expenditures. Based on what he viewed as a conservative gross income figure, Weiner estimated that the value of the collateral fell within a range of $125,000 to $165,000. He explicitly stated that he did not include, for purposes of the estimate, any elements of the business not encompassed by his company's security interest. But he did view the collateral as a package, marketable as an income producing dry-cleaning business. Again, the court gave no weight to Weiner's testimony, not because of any failing in Weiner's competency, but because the court held the creditor lacked any claim to the "income-producing potential" of the business.

The majority opinion gives the impression that the court below rejected Weiner's entire declaration for lack of foundation. But a close reading of the record reveals that the court made only two, very limited, evidentiary rulings. First, the court excluded Weiner's estimate that the equipment would sell for $45,000 if torn out of the existing operation and sold off-site. Given that Weiner himself stated that selling the equipment off-site would amount to "economic disaster" and, given that Weiner's company, in its entire history, never attempted to first remove equipment from the leasehold before selling it, it is hardly surprising that the court excluded Weiner's estimate of an off-site sales price. What is so surprising is that the court, in the next breath, accepted the Debtors' estimate of value premised upon the same imaginary course of action the court had just rejected when proposed by the creditor. The Debtors, too, had never conducted an off-site sale of dry cleaning equipment. For that matter, the Debtors (unlike Weiner or Rix) had never sold any dry-cleaning equipment at all. More importantly, the Debtors had no intent of separately selling the equipment, they planned on using it in a going concern and that is how it should have been valued.

12. The participants at the hearings focused on claim objections, but the proceedings also served as plan confirmation hearings. Even if Rix's valuation of $165,000 for the entire business was irrelevant for the purpose of valuing Great Northern's claim under § 506(a), Rix's valuation was still relevant for the purpose of plan confirmation and remained uncontradicted. The Debtors' amended chapter 13 plan proposed total payments of approximately $81,500, with the unsecured creditors to receive roughly thirty-one cents on the dollar. If the business were sold as a turn-key for a price of $165,000, all creditors, secured and unsecured, could be paid in full. See 11 U.S.C. § 1325(a)(4). In effect the Debtors have purchased the business at a 50% discount to the detriment of all creditors.

In the other evidentiary ruling, the court excluded Great Northern's evidence of comparable sales. In his declaration, Weiner included the sales figures for the eleven repossessed businesses resold by his company in the three years preceding the hearings. Significantly, in every instance, Great Northern, because it held both the lease and the equipment, marketed the site as a "turn-key" package. Never had it needed anything more than the lease, the leasehold improvements, and the dry-cleaning equipment to successfully resell a location based on its income-producing potential. The court noted that Weiner failed to include the exact locations, the dates of sale, or names of the purchasers. I fail to see why that information is vital and I believe the court abused its discretion in denying the creditor a continuance. But that is to lose sight of the bigger picture: the court only excluded limited pieces of evidence. As for the bulk of Weiner's testimony, the court simply neglected it because the court held Great Northern lacked a "turn-key situation". That finding is a misconception of Great Northern's security interest and is reversible error.

Finally, it is interesting to contrast the above rulings with the evidence the court ultimately endorsed when valuing Great Northern's claim: the unadorned statement of value listed by chapter 13 debtors in their inventory of personal property on Schedule B. The Debtors simply inserted the number "$34,000" as the value of the dry cleaning equipment when they filled out their twenty-plus pages of schedules and forms, and the court accepted it as dispositive. Not a single question was asked of the Debtors as to how they came up with that amount. No examination of the Debtors' factual basis and no probing of the Debtors' methodology appears anywhere in the record. On appeal, the Debtors point out that Schedule B asks for "Current Market Value". That, and the fact that courts have held a debtor is competent to give an opinion as to the value of estate property is all that supports the court's valuation of Great Northern's secured claim.

### CONCLUSION

The court held that Great Northern lacked a turn-key operation or any security interest in the business as a whole. That is a clearly erroneous finding of fact which deprived Great Northern of its carefully bargained for rights. The court then valued each component of Great Northern's collateral as if detached from the business and separately sold "off-site" in a "reasonable disposition". That was an error of law. Because of these errors, the court below rejected Great Northern's evidence as irrelevant when such evidence was, in fact, the most relevant offered. For the foregoing reasons, I would remand the case for further hearings consistent with the Ninth Circuit's decision in *In re Taffi.* Consequently, I respectfully dissent.